[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 11, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-10744

_____

D.C. Docket No. 98-00464-CR-LCN

UNITED STATES OF AMERICA

Plaintiff-Appellee,

versus

JORGE GUERRA, CESAR TELLEZ, LOUIS ORDONEZ,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(June 11, 2002)**

Before BLACK and RONEY, Circuit Judges, and RESTANI*, Judge.

_____

* Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

RESTANI, Judge:

Defendants-Appellants Jorge Guerra, Cesar Tellez, and Louis Ordonez ("Appellants") appeal their convictions and sentences for conspiracy to traffic in counterfeit cigars in violation of 18 U.S.C. § 371, for trafficking in counterfeit cigars in violation of 18 U.S.C. § 2320, and for aiding and abetting such violations. All Appellants argue that their convictions were not supported by sufficient evidence and that the district court erred in applying the sentencing guidelines based on the value and number of the "infringing items." In addition, Appellant Guerra claims that (1) the jury was not properly instructed as to an element of the substantive offense (specifically, whether the genuine trademarks were "in use"), or as to "attempt"; and (2) the district court erred in denying Guerra's motion for a mistrial, which asserted that his Fifth Amendment Right against Self-Incrimination was violated by a government witness's comments. We affirm the convictions and remand for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Cesar Tellez is the owner of Alpha Foil Stamping, a business that engages in embossing and foil stamping for printers. Defendant Guerra owns and operates Panorama Printing shop. Defendant Louis Ordonez is a cigar dealer who owned and operated the Don Louis Cigar Company.

2

On June 1, 1998, Special Agents with the United States Secret Service seized from Ordonez's home various boxes, cigar rings or bands, and cigars bearing labels of various marks, as well as different types of "Made in Cuba" printing plates. Ordonez waived his Miranda rights and admitted that he sold four to five boxes of counterfeit cigars a week, and that he had been selling them for approximately one year (i.e., approximately 234 boxes total) at a price of $40 to $100 per box. The Agents subsequently seized labels and other items from Tellez's foil stamping business, and from Guerra's print ship.

On November 11, 1998, a federal grand jury returned a seven-count indictment (superseding a three count indictment on June 19, 1998), alleging that from on or about March 11, 1998 through on or about June 5, 1998, Appellants conspired to intentionally traffic in cigars bearing counterfeit marks in violation of 18 U.S.C. § 2320 (Count One). The indictment alleged that the Appellants had intended to produce counterfeit cigar rings, affix them to inferior grade cigars, package them with counterfeit labels for sale as more expensive, higher grade cigars under separate U.S.- trademarked brands.[1]

_____

[1] These trademarks are as follows: "Cohiba" (corresponding to Count II), "Monte Cristo" (Count III) and "Romeo y Julieta" (Count IV) cigars. Only Ordonez was charged with trafficking in goods bearing the counterfeit marks of "Punch" (Count V) and "Bolivar" (Count VI), while Tellez was the only defendant charged for the counterfeit mark "Fuente y Fuente Opus X" (Count VII). The "Montecristo" trademark is registered with the United States Patent and Trademark Office to Cuban Cigar Brands, N.V., a subsidiary of Consolidated Cigar

3

After a four-day trial, the jury reached a guilty verdict convicting all of the defendants on all counts. On January 25, 2000, the district court sentenced Tellez to 27 months and Guerra to 18 months incarceration, respectively. On March 14, 2000, the district court sentenced Ordonez to 18 months incarceration.

## DISCUSSION

### I. Sufficiency of the Evidence

Appellants argue that there was insufficient evidence to support their respective convictions for Conspiracy to Traffic in Counterfeit Cigars, and for the substantive offenses of Trafficking in Counterfeit Cigars in violation of the Trademark Counterfeiting Act ("TCA").[2]

### A. Conspiracy under 18 U.S.C. § 371

The essential elements of the offense of conspiracy under 18 U.S.C. § 371 are an agreement between two or more persons to commit a crime against the United States and an overt act by one of them in furtherance of the agreement. See United States v. Yamin, 868 F.2d 130, 133 (5th Cir. 1989). The government must

Corporation; the "Romeo y Julieta" trademark is registered to Max Rohr Importer, Inc.; the "Bolivar," "Cohiba," "Punch," and "Hoyo de Monterrey" trademarks are registered to General Cigar Company, Inc.; and the "Fuente y Fuente Opus X" trademark is registered with Fuente and Fuente Cigar, Ltd.

[2] Under 18 U.S.C. § 2320(a), "whoever intentionally traffics or attempts to traffic in goods . . . and knowingly uses a counterfeit mark on or in connection with such goods . . . shall, if an individual, be fined not more than $250,000 or imprisoned not more than five years, or both . . . ."

prove beyond a reasonable doubt that the defendant knew of the conspiracy and that he voluntarily became a part of it. Id. The existence of a conspiracy may be proved by circumstantial evidence and may be inferred from concert of action. Id.

Whether there was evidence sufficient to support a conviction is a question of law subject to de novo review. See United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990). In conducting such a review, the Court must determine whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), aff'd, 462 U.S. 549 (1983). Appellants argue that no reasonable trier of fact could have found a conspiratorial agreement where: (1) Guerra and Tellez did not know each other personally; (2) Guerra worked with Tellez as a subcontractor prior to the period of the charged offenses; and (3) neither Guerra nor Tellez possessed cigars, or took part in affixing labels on cigars.

None of these alleged facts, either alone or in conjunction, defeat the conspiracy conviction in this case. A defendant may be found guilty of conspiracy if the evidence demonstrates that he knew the "essential objective" of the conspiracy, even if he did not know all its details or played only a minor role in the overall scheme. See United States v. Alvarez, 625 F.2d 1196, 1198 (5th Cir. 1980) (en banc), cert. denied, 451 U.S. 938 (1981). Nor must the government show that

each defendant had direct contact with each of the other alleged co-conspirators. See United States v. Walker, 720 F.2d 1527, 1538 (11th Cir. 1983), cert. denied sub nom., Gustin v. United States, 465 U.S. 1108 (1984).

The essential objective of the conspiracy among the defendants was defined in the indictment as "to unlawfully enrich themselves by causing counterfeit cigar rings and box labels to be produced and attached to inferior grade cigars and boxes so that they could be sold and offered for sale as finished boxes of more expensive, high quality cigars." We find that the aggregate of the evidence is sufficient for a jury to infer that the Appellants knew the essential objective of the conspiracy. The Government's expert witness Richard Outland, the lead document examiner of the document authentication section in the forensic laboratory at the United States Secret Service, testified as to the common origin of items seized from the premises of each of the three co-defendants, including stamps, typographic plates, photographic negatives, and cigar bands. In addition, the Government introduced evidence of a receipt of sale between Tellez and Ordonez, and an entry in Guerra's address book referring to Tellez. A trier of fact reasonably could infer from this evidence that each defendant acted in concert with the other two in a process to cause certain counterfeit cigar rings and labels to be produced and attached to cigars and boxes to be sold as the genuine product.

Appellants argue that the materials of "common origin" and other evidence merely show that the defendants were engaged in a series of "buy-sell" transactions. See United States v. Mercer, 165 F.3d 1331, 1335 (11th Cir. 1999) (where a "buy-sell" transaction itself constitutes a substantive offense, evidence of that transaction alone is insufficient to support an inference of conspiracy). The buyer-seller rule in the context of counterfeit goods is directed primarily at distinguishing co-conspirators from individual purchasers of the goods, who clearly fall outside the purview of the TCA. See 130 Cong. Rec. 31675 (1984) (Joint Explanatory Statement on Trademark Counterfeiting Act of 1984) ("[I]t is not a crime under this act for an individual knowingly to purchase goods bearing counterfeit marks, if the purchase is for the individual's personal use."). Unlike in cases involving isolated "buy-sell" transactions, the defendants in this case were involved in a manufacturing and sales process that could reasonably serve as a basis for inferring the existence of a "prior or contemporaneous understanding . . . beyond the sales agreement."[3] Id. at 1334.

This conclusion is supported by evidence and testimony regarding the

---

[3] The Government describes the process as follows: "Ordonez had ordered the production of cigar bands and labels bearing counterfeit marks, used the bands to wrap $0.23 cigars, affixed the labels to cigar boxes, and sold boxes of cigars bearing counterfeit trademarks. Guerra and Tellez had used printing plates that Ordonez had provided or created such plates themselves, and then printed and foil-stamped counterfeit copies of the cigar trademarks."

duration and repetition of the transactions. See United States v. Beasley, 2 F.3d 1551 (11th Cir. 1993), cert. denied, 512 U.S. 1240 (1994) (affirming conspiracy conviction where there was evidence of a continuing relationship based on several purchases of cocaine and deferment of payment; joint arrangement of delivery; and knowledge of where cocaine was being sold). The jury also reasonably could have inferred from the quantity of labels and cigars and the nature of each of the defendants' businesses that the transactions were for the purpose of resale. Cf. United States v. Dekle, 165 F.3d 826, 829-30 (11th Cir. 1999) (reversing a conspiracy conviction based on the reasoning that the small-quantity drug transactions were for the purpose of supporting the purchaser's personal drug habit rather than for resale). Accordingly, the buyer-seller rule is inapposite to the commercial supplier-dealer relationship among the defendants in this case.

**B. Substantive Offense of Trafficking in Counterfeit Goods, 18 U.S.C. § 2320**

1. Trafficking in Goods

Appellants Guerra and Tellez assert that the printing of labels in and of itself does not constitute "trafficking in goods" either under the meaning of 18 U.S.C. § 2320, or as charged in the indictment. Appellants Guerra and Tellez rely on United States v. Giles, 213 F.3d 1247 (10th Cir. 2000), for the proposition that Section 2320 does not forbid the act of trafficking in counterfeit labels unconnected to any

goods. At issue in the Giles case were wholesale "patch sets," which consisted of a leather patch and gold medallion bearing a federally registered designer logo and a leather strap used to attach the medallion to a purse or piece of luggage. The patch set could be sewn or glued onto a generic purse or piece of luggage to give the appearance that the generic purse or luggage was actually a branded product. The Tenth Circuit found that the labels sold by the defendant in that case did not constitute "goods." The Court reasoned that because the statute requires that a defendant intentionally traffic in goods, and that he or she knowingly use a counterfeit mark "on or in connection with such goods," the term "goods" was "intended to be viewed as separate and distinct from the marks they carry." Giles, 213 F.3d at 1251. But see United States v. Koehler, 24 F.3d 867 (6th Cir. 1994) (upholding conviction under TCA without questioning the propriety of charging defendant with a separate count of trafficking in labels, where such labels were actually used on counterfeit auto parts provided by an undercover agent), cert. denied, 513 U.S. 1077.

Unlike in Giles, the indictment in this case did not charge Guerra and Tellez with trafficking in counterfeit labels as the "goods," nor did Giles address the criminal liability of a label maker in the context of a conspiracy charge. The indictment charged each Appellant with knowingly trafficking and attempting to

9

traffic in "goods, to wit, cigars." Although there does not appear to be evidence

that either Guerra or Tellez themselves "transported, transferred, or otherwise

disposed of" the cigars, the labels they manufactured were actually used by a co-

conspirator, Ordonez, to render the inferior cigars counterfeit, which he in turn sold

for a profit. See 18 U.S.C. § 2320(d)(2) (defining "traffic" as to "transport,

transfer, or otherwise dispose of, to another, as consideration for anything of

value").[4]

## 2. Knowing Use of a Counterfeit Mark

Appellant Guerra claims that there is insufficient evidence that he

"*knowingly* used a counterfeit mark on or in connection with" the cigars where the

labels specifically indicated Cuba as the country of origin. Guerra claims that the

country designation indicates that he intended to imitate Cuban, not U.S. trademark

---

[4] Even if the defendants were not charged with conspiring to traffic in counterfeit cigars, Guerra and Tellez would still be liable as principals for aiding and abetting in the substantive offense. Indeed, the Giles Court specifically recognized that "creating or trafficking in counterfeit labels could expose a defendant to liability as an aider and abetter in the substantive offense." Giles, 213 F.3d at 1251 n.6. The Giles Court did not reach the issue of whether the defendant in that case could in fact be convicted for aiding and abetting, however, as the Government did not so charge the defendant in that case. In this case, in contrast, Appellants were charged under Section 2320 and Section 2 ("aiding and abetting"), and the judgment reflects that they were convicted under both sections. The evidence supports the Government's charge that by manufacturing labels Guerra and Tellez aided and abetted counterfeit cigar dealers such as Ordonez in trafficking.

cigar labels. Under the TCA, a "counterfeit mark" is defined as a "spurious mark" that is:

> used in connection with trafficking in goods or services; that is identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register of the U.S. Trademark and Patent Office and in use, *whether or not the defendant knew such mark was so registered*; the use of which is likely to cause confusion, to cause mistake, or to deceive . . . .

18 U.S.C. § 2320(d) (emphasis added).

Thus, it is irrelevant that Guerra did not know the marks were registered in the United States, or thought the marks were only unprotectable Cuban marks. The jury was presented with evidence that Guerra knew the marks were not genuine. Guerra does not assert that Ordonez and other purchasers of his labels represented they were authorized representatives of the trademark owners or licensees. Guerra admits that he continued to produce labels even after realizing that "not all those people could be from the Cuban government." Guerra Br. at 33. Thus, the jury could have made a reasonable inference that he knew the labels were not being sold to authorized Cuban <u>or</u> United States producers of the trademarked cigars.

### 3. Identical or Substantially Indistinguishable

Appellant Guerra claims that jury was not presented with evidence that would enable them to determine whether the labels were "identical or substantially indistinguishable" from the U.S.-registered trademarks for those goods.

11

Specifically, Guerra maintains that: (1) no genuine Cohiba or Romeo y Julieta label, or cigar to which such a label was affixed, was introduced into evidence or shown to the jury; (2) no representative from any of the companies owning the trademarks testified; and (3) the agents who testified were not cigar experts. Guerra Br. at 31.

The "identical or substantially indistinguishable" standard is to be construed more narrowly in a criminal context than in a civil context. The legislative history of Section 2320 indicates that:

> [A] mark need not be absolutely identical to a genuine mark in order to be considered counterfeit. Such an interpretation would allow counterfeiters to escape liability by modifying the registered trademarks of their honest competitors in trivial ways. However, the sponsors do not intend to treat as counterfeiting what would formerly have been arguable, but not clear-cut, cases of trademark infringement.

130 Cong. Rec. at 31,676. The statute does not specify the means by which the Government may establish that the marks were "identical or substantially indistinguishable." There is no support for the proposition that in all cases, the trier of fact must determine indistinguishability based on the marks as affixed to the actual goods. Nor is there a requirement that the actual trademark owner testify in a criminal trial, or that the agent who conducted the investigation and seizure of the counterfeit merchandise be qualified as an expert in the particular

12

type of product.  In this case, the jury had been shown registered designs of the trademarks for each cigar, as well as various cigar labels or bands produced by authorized licensees.  The jury therefore had a valid basis for comparison in determining whether the designs were "identical or substantially identical."

## II.  Motion for a Mistrial:  Fifth Amendment Right against Self-Incrimination

Appellant Guerra appeals the district court's denial of the motion for mistrial on the grounds that his Fifth Amendment Right against self-incrimination had been violated by comments made by a government witness, Agent Robert Villanueva, during trial.  Specifically, Guerra asserts that during cross-examination as to whether Agent Villanueva knew whether Guerra sold counterfeit cigars, Agent Villanueva improperly drew the jury's attention to Guerra's "silence" by indicating that Guerra would be in a better position to answer certain questions.[5]  Guerra

---

[5]     The trial transcript reads in relevant part as follows:

Counsel: Do you know when the cigar rings that specifically were seized from my client, the limited number of Romeo y Julieta, Cohiba and Montecristo, when those were manufactured?
Witness: *You would have to ask your client that*.
Counsel:  Okay.  You don't know when they were manufactured.
Witness:  No.

* * *

Counsel: Isn't it true that you do not know if these items are sold to the public?
Witness: To the public here in the [United States]?
Counsel: Right.
Witness: *Your client was merely a printer of the item.  I have no idea whether they sold any.  I*

13

asserts that the court's subsequent curative instruction was ineffective, and that the testimony prejudiced the fairness of the trial.

The "constitutional harmless error" standard applies to review of a denial of a motion for mistrial on the basis of an alleged violation of Fifth Amendment Right against self-incrimination. See United States v. Smith, 635 F.2d 411, 413 (5th Cir. Unit B 1981) (finding admittedly improper comment on defendant's silence by government witness to be harmless error where court gave clear curative instruction and polled jury as to whether they could disregard comment). A comment is deemed to be a reference to the defendant's silence if "either (1) it was the prosecutor's manifest intention to refer to the defendant's silence, or (2) the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on defendant's silence." Id. at 413. Here, Guerra's claim of "silence" is misleading, as he did in fact testify at trial, and specifically testified that there were never any cigars in his shop. See Trial Tr. at 772. Furthermore, there is no ground for concluding that the jury would naturally and necessarily

_mean you would have to ask him that._
The Court: Agent, stop saying "you have got to ask . . ."--
Counsel: Your honor, I'm going to move for a mistrial because --
The Court: Don't move for a mistrial in the presence of the jury.
    [to Witness] Don't say any more, "Go ask the client." I mean, he's asking you, so don't say that again, please.
Witness: Yes, your Honor. Excuse me.

14

construe the comment to refer to Guerra's supposed silence, as the context of the statement reveals that the witness was referring to his inability to answer the question, and was clearly minimizing Guerra's role in the counterfeiting operation. See trial transcript supra n 7 ("Your client was merely a printer of the item."). If anything, Agent Villanueva's answers indicate that he did not believe Guerra to have sold any counterfeit cigars.

Even assuming the statements made by Agent Villanueva in fact referred to Guerra's "silence," Guerra has not shown that the curative instruction was deficient, or that the statements are somehow incurable. In its curative instruction, the district court specifically referenced Agent Villanueva's comment and clearly explained the reasons why the jury should not speculate as to whether Guerra was in a position to answer the question.[6] Guerra's allegation that the curative instruction was untimely is also unpersuasive. The judge had instructed the witness immediately after the comments were made that he should simply answer

_____

[6] The curative instruction is as follows:

"[M]ention was made by this witness yesterday in answer to some certain questions: "Well, ask your client or ask somebody else." Now, a witness's testimony must be based upon what the witness knows, not what somebody else knows. Now, I remind you again that in a criminal case, the burden is on the government to prove a defendant's guilt beyond a reasonable doubt. The defendant need not testify, nor present any evidence, and you must not hold it against a defendant if he does not do so. . . . So I want you to disregard and completely strike from your mind any reference to the fact that another witness could answer the question better or might know the answer to a certain question. So you are to disregard any comments in that regard and not speculate what somebody else might have said."

15

"no" if he lacks personal knowledge to answer. The jury could not have been confused as to which comments the judge was referring in his subsequent curative instruction, in light of the judge's almost verbatim quote of Agent Villanueva's testimony.

## III. Jury Instructions

Review of a district court's jury instructions is for abuse of discretion. United States v. Morris, 20 F.3d 1111, 1114 (11th Cir. 1994). Guerra contends that the judge (1) misstated the law with respect to the "continued use" element of the TCA, and (2) failed to include an instruction on "attempt."[7]

### A. Continued Use

The district court instructed the jury that trademark registration is prima facie evidence of the validity of the mark as well as the owner's "continued use" of the registered mark, in accordance with its previous ruling that registration is prima facie proof of continuing use "would apply to criminal as well as civil cases."[8]

---

[7] Guerra also asserts that the district court erred in failing to hold a charge conference, but omits that (1) the Appellants had not submitted any proposed jury instructions, and (2) each jury instruction issue had been argued at the close of the government's case.

[8] The jury instruction reads as follows:

The evidence in this case includes copies of the following certificates of registration of the trademarks for the following cigars: Montecristo, Romeo y Julieta, Cohiba, Punch, Bolivar, and Fuente y Fuente Opus X. . . . The certificates are prima facie evidence of the validity of the registered mark, of the ownership of the mark, of the owner's exclusive right to use the registered mark, and the owner's *continued use* of the registered mark. "Prima facie" means

16

Guerra does not dispute that in a civil context, trademark registrations constitute prima facie evidence of continued use of the mark.  Guerra asserts that the district court erred in applying this presumption in a criminal context.

Guerra is correct that there is no support for the application of the entire civil presumption in a criminal context.  Under the statute, the genuine mark must not only be federally registered, but it also must be *actually* in use.  The term "counterfeit mark" is defined as:

> (A) a spurious mark--
>     (i) that is used in connection with trafficking in goods or services;
>     (ii) that is identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered; and
>     (iii) the use of which is likely to cause confusion, to cause mistake, or to deceive; . . .

18 U.S.C. § 2320(e)(1)(A)(ii) (emphasis added); see also 130 Cong. Rec. 31674.  Thus, the Government is not absolved of its burden to show that the genuine marks are "in use" simply by presenting certificates of registration.  Therefore, the jury instruction allowing for such a presumption of use is in error.  See Sandstrom v. Montana, 442 U.S. 510, 524 (1979) (evidentiary presumptions in a jury charge

---

sufficient evidence to establish that the mark is valid, that the registrant owns the mark, and has the exclusive right to use it, and the owner continues to use the mark.

may not be used if they have the effect of relieving the state of its burden of persuasion beyond a reasonable doubt of every essential element of the crime).

Nevertheless, the harmless error doctrine applies to a Sandstrom error if it is determined "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Davis v. Kemp, 752 F.2d 1515, 1521 n.7 (11th Cir. 1985) (en banc) (citation omitted). A Sandstrom error can be harmless beyond a reasonable doubt under two circumstances: (1) where the faulty instruction applied to an element of the crime is not at issue at the trial; or (2) where evidence of guilt was "overwhelming." Id. at 1521. The error in this case is clearly harmless as the Appellants do not dispute that they themselves introduced evidence of a presumably current issue of a periodical that pictured, described, and rated all the trademarked cigars.[9] The record shows that Appellants did not contest whether the trademark owners actually sold the genuine merchandise for the duration of the counterfeiting operation. Thus, if properly charged, the jury would have concluded that the genuine trademarks were "in use" at the time of the counterfeiting conspiracy.

**B. Attempt**

---

[9] The Court also notes that at sentencing the Government submitted affidavits showing the current market value of the genuine cigars. Defendants did not assert that the genuinely marked cigars were no longer sold.

Although the indictment charged the defendants with "trafficking and attempting to traffic," the Appellants argue that the district court erred in not instructing the jury on attempt. To the extent this omission is error, it is undoubtedly harmless as the jury was charged with finding actual completion of the act of trafficking, and Guerra and Tellez were convicted as principals for aiding and abetting Ordonez, who was convicted for trafficking in counterfeit cigars.

## IV. Sentencing Guidelines

Interpretation of the Sentencing Guidelines is reviewed <u>de novo</u>, with factual findings reversible if clearly erroneous. See <u>United States v. Cunningham</u>, 194 F.3d 1186, 1201 (11th Cir. 1999). Review of the district court's application of the Guidelines to the facts is for abuse of discretion. <u>See</u> <u>United States v. Cooper</u>, 173 F.3d 1192, 1204 (9th Cir. 1999). Individuals convicted for violating section 2320 are sentenced pursuant to United States Sentencing Guideline 2B5.3(a), which sets the Base Offense Level at 6. Loss valuation under 2B5.3 is "the retail value of the infringing item, multiplied by the number of infringing items." § 2B5.3 cmt. n.2(B). Section 2B5.3(b)(1) provides that "if the retail value of the infringing items exceeded $2,000, increase by the corresponding number of levels from the

19

table in § 2F1.1 (Fraud and Deceit)."[10]

Guerra and Tellez argue that because in their case the "infringing items" at issue are the unattached counterfeit bands and labels, rather than the counterfeit cigars, the assigned value should be based on the *retail value of the labels and bands*. In the alternative, Tellez argues that he should be held accountable only for the 3,792 counterfeit cigars *actually sold* by Ordonez.

## A.  Value of "Infringing Items"

The Ninth Circuit in United States v. Bao, addressed the issue of the proper valuation of the "infringing items" in the context of a printer's involvement in a conspiracy to traffic in counterfeit software. 189 F.3d 860, 866 (9th Cir. 1999). There, the district court had assigned a sentencing enhancement to the printer of counterfeit Microsoft computer software operation manuals that was based on the retail value of the entire counterfeit software package into which the manuals were eventually inserted. See id. at 867. The Court remanded for resentencing,

---

[10] The relevant conduct guideline §1B1.3, and its commentary and examples make clear that in the case of jointly undertaken criminal activity, a defendant is responsible for the conduct of others only if it was both in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that activity. Note One to §1B1.3 states that the principles and limits of sentencing accountability under § 1B1.3 are not always the same as the principles and limits of criminal liability. According to subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator.

reasoning that the "retail value" of the manuals, not the "loss" derived from their production, is the proper measure for determining the sentencing. See id; see also United States v. Cho, 136 F.3d 982, 983-84 (5th Cir. 1998) (finding that Section 2B5.3 "retail value" and Section 2F1.1 "loss" were distinguishable, and that only retail value should be used to determine the proper enhancement under the § 2F1.1 table when sentencing under § 2B5.3). The court rejected the Government's argument that the manual's value could not be separated out from the value of the whole package ($50) where there was evidence that comparable genuine manuals Microsoft sold individually had a retail value of $12. In this case, unlike in Bao, there is no evidence that the bands and labels are sold at retail individually. The value of the bands and labels is inextricably intertwined with that of the completed product, as the value of the counterfeit cigars derives primarily from the degree to which the bands and labels bear marks that are indistinguishable from the genuine marks. Thus, the district court did not err by considering "infringing items" to be cigars rather than labels.

The district court erred, however, by relying in part on the value of *genuine* cigars where there is sufficient evidence of the value of the counterfeit items and

no findings as to the quality of the counterfeit goods.[11] The district court considered the Government's valuation of the counterfeit cigars and decided to use the upper end of the valuation based on affidavits regarding the value of the genuine cigars. The value actually assigned ($4.00), however, still falls within the range specified by Ordonez as the amounts he charged for the counterfeit cigars ($40 to $100 per box, or $1.60 to $4.00 per cigar). There is no support for Appellant Guerra's contention that the district court was under an obligation to calculate an "average" value rather than selecting a value within the range. Nonetheless, because we remand for resentencing on the valuation issue based on court's method of determining the number of infringing items, the district court will have the opportunity to decide if the $4.00 is the appropriate retail value of the counterfeit, not genuine, merchandise.

---

[11] Courts have based an enhancement on the actual retail price of the genuine merchandise where there was insufficient evidence of the value of the infringing items, or there were no findings as to whether they could have been sold in "normal retail outlets." For example, in United States v. Kim, 963 F.2d 65, 69 (5th Cir. 1992), the Fifth Circuit held that where there was *insufficient evidence* of the retail value of the infringing items, "the retail value of genuine merchandise is relevant in determining the retail value of the infringing items." Additionally, in United States v. Larracuente, 952 F.2d 672 (2d Cir. 1992), the Second Circuit found the district court correctly used the retail value for genuine merchandise to determine the increase in the defendant's offense level under section 2B5.3. Id. at 674. The Second Circuit reasoned that, because "unauthorized copies [of bootleg tapes] are prepared with *sufficient quality* to permit their distribution through normal retail outlets, the value of the infringing items is their normal [i.e. genuine] retail price . . . ." Id. (emphasis added). The Second Circuit expressly noted, however, that "[w]e would have a different question if the infringing items were of obviously inferior quality and were for that reason distributed to consumers who pay far less than the retail price for authentic items." Id. at 675.

**B. Number of "Infringing Items"**

Although the district court based the value of the "infringing items" on the retail value of *cigars*, it based the number of "infringing items" on the number of *labels* found on the premises of each defendant. This shift in definition resulted in Tellez receiving a 10-level increase based on the 155,017 labels seized from his premises (multiplied by the $4.00 value per cigar for a total assessed value of $620,068), and in Guerra receiving a 7-level increase based on the 40,862 labels seized from his premises (also multiplied by the $4.00 value per cigar for a total assessed value of $163,448).

Appellants rely on United States v. Kim Tae Sung, 51 F.3d 92 (7th Cir. 1995), appeal after remand, 87 F.3d 194 (7th Cir. 1996), on remand to, 940 F. Supp. 172 (N.D. Ill. 1996), and rev'd on other grounds by, 114 F.3d 1192 (1997), for the proposition that the number of infringing items should correspond to the number of completed or nearly completed goods counterfeit goods. We find the reasoning of our sister Circuit persuasive. The defendant in Kim Tae Sung produced and distributed hair care products; when arrested, he had over 1,000 gallons of product but bottles and boxes for much more. See Sung, 51 F.3d at 93. The district court sentenced Sung based on the potential sales represented by the bottles and boxes. The Seventh Circuit remanded for resentencing based on the

ground that where a defendant takes a step toward the sale of completed counterfeit goods, the district court must make findings as to whether the Government established with "reasonable certainty" defendant came close to completing additional sales of the counterfeit good. See id. at 95-96. The Court indicated that it would be clearly erroneous to assign the number of "infringing items" based on potential sales according to the total number of containers, especially where the defendant possessed only a limited amount of materials and there was evidence of low market response that undermined the probability of such sales.

We find that the district court erred in assigning the number of "infringing items" according to the labels seized. First, the district court must be consistent in its definition of "infringing items" for the purpose of sentencing under § 2B5.3. If the drafters of 2B5.3 cmt. n.2(B), supra, intended the district court to have discretion to shift the meaning of the term "infringing item" within the same calculation, they would have so indicated. Furthermore, the district court erred in not making findings during sentencing as to: (1) how close the defendants came to completing additional sales; (2) whether there was a reasonable likelihood of generating revenue corresponding to the amounts assigned, i.e., $620,068 in the

case of Tellez, or $163,448 in the case of Guerra.[12] Rather, the district court assigned a total number of "infringing items" based on the number of labels simply because the labels constituted "part" of the conspiracy.[13] There is no support for the proposition that the number of "infringing items" may be based on the number of seized articles that have the mere <u>potential</u> of ultimately forming a component of a finished counterfeit article, without a determination as to the extent to which defendants had a reasonable likelihood of actually completing the goods. The record shows, and the Government concedes, that Ordonez had received 5,125 inferior-quality cigars from the Dominican Republic, some of which had been already sold using counterfeit bands and labels. There is no evidence in the record of other past shipments, thus, the court's total valuation of the infringing items may not be sustained on this record.

---

[12] The Government maintains that in contrast to <u>Sung</u>, "Guerra and Tellez simply had to disburse their counterfeit bands and labels to enable Ordonez and other counterfeit distributors to turn a $0.23 cigar into a $4.00 cigar. The cigar bands were not perishable and could be used to create counterfeit cigars indefinitely." These arguments were not made during sentencing, and the district court did not base its decision on the ease of assembly or the length of time the bands would be useable.

[13] At sentencing, Tellez objected to the district court's use of the number of labels on the ground that it is improper to consider the labels as finished products. The district court overruled the objection, reasoning that:

> [T]he labels are just one part of an infringing item, and that Mr. Tellez was convicted, along with the other defendants, of a conspiracy to counterfeit . . . and sell the counterfeit cigars. Being in possession of the labels was just one part of the conspiracy. So I am holding him responsible for all of the counterfeit items, not just the labels.

Accordingly, the judgment's convictions are AFFIRMED, and the case is REMANDED for resentencing.