[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-10106

_____

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
December 17, 2008
THOMAS K. KAHN

D. C. Docket No. 06-20169-CR-FAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN PENTON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(December 17, 2008)**

Before BIRCH and MARCUS, Circuit Judges, and FORRESTER,* District Judge.

PER CURIAM:

---

*Honorable J. Owen Forrester, Senior United States District Judge for the Northern District of Georgia, sitting by designation.

Defendant, Juan Jose Penton, was prosecuted for violating 18 U.S.C. § 2320(a), the Trademark Counterfeiting Act. After a jury trial, Penton was found guilty and the court sentenced him to five years' probation with five months of home confinement, a $7500 fine and a $300 special assessment. On appeal, Defendant argues that (1) the district court erred in denying his motion for judgment of acquittal for the insufficiency of the evidence in general and specifically with reference to Count 3 of the indictment; (2) the district court erred in refusing to give Defendant's requested jury instruction on his theory of the defense; and (3) the Government's improper closing argument deprived Defendant of his due process right to a fair trial. After a thorough review, we find no reversible error and affirm.

## I.  Background

The indictment charged Defendant with three counts of trafficking and attempting to traffic in counterfeit goods – cigars – on October 5, 2005. Count 1 of the indictment alleges trafficking of Cuban Cigar Brands, N.V. ("CCB") marks, Count 2 of Max Rohr marks, and Count 3 of General Cigar Co. marks. Three other counts were dropped by the Government at trial and are not at issue.

CCB is a corporation of the Netherlands Antilles with its principal place of business in Fort Lauderdale, Florida. CCB owns the United States trademarks for

the following brands and associated artwork:  Monte Cristo, H. Upmann, and Por Larranaga.  Max Rohr is a Delaware corporation with its principal place of business in Delaware.  Max Rohr owns the United States trademarks for Romeo y Julieta and Trinidad.  Altadis U.S.A. is a Delaware corporation with its principal place of business in Fort Lauderdale, Florida.  Altadis U.S.A. is the exclusive licensee of CCB and Max Rohr.

General Cigar Co. is a Delaware corporation with its principal place of business in New York, New York.  General Cigar owns the United States trademarks for Cohiba, Partagas, Flor de Tabacos de Partagas YCA, Hoyo de Monterrey, Hoyo de Monterrey de Jose Gener Excalibur, Bolivar Simon Bolivar, Simon Bolivar the Liberator, Punch Elite, Punch Punch, Punch Gran Fabrica de Tabacos Punch, and de J. Valley ca Manuel Lopez Habana.

The police investigation of Penton began when Altadis U.S.A. provided information to the Miami-Dade County police that enabled them to send an undercover officer to Defendant's shop.  In a sting that occurred on October 5, 2005, Defendant sold to the officer and a confidential informant sixty boxes of cigars:  fifteen boxes of Cohiba Esplendidos, ten boxes of Montecristo Number 2, ten boxes of Romeo y Julieta Churchill, ten boxes of Partagas Lusitania, ten boxes of Hoyo de Monterrey Coronas, and five boxes of Hoyo de Monterrey Pyramid.

3

The boxes contained a combination of trademarked terms and artwork as well as the words "Habana," "Habana, Cuba," "Habanos SA," and "Hecho en Cuba." The boxes were sealed with fabricated Cuban seals and contained fake Cuban government guarantees in the boxes. "Habana" was also printed on the cigar rings. DE150, at 82-83.

Eric Workman, Altadis U.S.A.'s vice-president of marketing and national accounts, testified at trial. He identified trademarked names and artwork for Montecristo, Romeo y Julieta, Trinidad, H. Upmann, and Por Larranaga. DE150, at 67-82. Mr. Workman published to the jury genuine cigar boxes, cigars, and cigar rings for these brands. Id. He also testified that the boxes sold by Defendant were not sold with Altadis U.S.A.'s authorization. Id. at 83-85, 91. Mr. Workman testified that he understood Defendant's boxes referenced Cuba, but that it was not unusual for genuine cigar manufacturers to reference Cuba in their packaging. DE150, at 91-99. Cooper Gardiner, vice president of marketing for General Cigar Co., provided similar testimony for the brands Partagas, Punch, Hoyo de Monterrey, Bolivar, and Cohiba. Genuine boxes, cigars, and cigar rings for these brands were published to the jury. DE152, at 50-55.

Defendant's witness, Gary Arzt, an investor, business consultant, and avid cigar smoker, also testified that most consumers do not see the outside of a cigar

box and simply ask for a brand name, such as Montecristo, without specifying whether it is the Cuban variety or variety sold in the United States. DE156, at 94-95. On cross-examination, Mr. Arzt testified that the artwork and trademark on Defendant's Romeo y Julieta cigar box was not substantially different from Altadis U.S.A.'s Romeo y Julieta product. Id. at 110-11. Mr. Arzt testified the same concerning Defendant's Partagas artwork and that trademarked by General Cigar in the United States. Id. at 111-12.

Defendant testified at trial that he was imitating the Cuban brands which were not protected in the United States. DE116, at 13-15. He said he did not think it was a crime to sell boxes of replica "Cuban" cigars. Id. at 15. He testified that he had never sold full boxes before the sting sale and his business was selling empty "Cuban" trademarked boxes that were replicas of what he had in Cuba as a child before the Revolution. Id.

Both at the conclusion of the Government's case and his defense, Defendant moved for a judgment of acquittal. Defendant argued that there was no evidence in the record that the Cohiba Esplendido and the Partagas Lusitania cigar brands were "in use" in the United States, as required by the statute. DE156, at 77-79. Defendant also contended that the evidence showed that there were "parallel" marks in the United States and Cuba and that Defendant's cigar boxes did not

5

imitate the United States marks, but rather the Cuban marks which are not protected in the United States under the structure of the Helms-Burton statute. As such, Defendant's conduct did not violate 18 U.S.C. § 2320(a). Id. at 80; DE158, at 36. With respect to Defendant's "in use" argument on the Cohiba Esplendido and the Partagas Lusitania cigars, the district court noted that in addition to those brands, Count 3 also encompassed the Hoyo de Monterrey brand for which there was testimony of "use" in the United States. Therefore, the court denied Defendant's motion on that basis but noted that it might eventually have implications for sentencing. DE156, at 79. The court also denied Defendant's motion on his Cuban imitation theory. Id. at 84-85.

## II. Discussion

### A. Sufficiency of the Evidence

We review the denial of a motion for judgment of acquittal and the sufficiency of the evidence to sustain a conviction de novo viewing the evidence in the light most favorable to the government, and drawing all reasonable inferences and credibility choices in favor of the jury's verdict. United States v. Campa, 529 F.3d 980, 992 (11th Cir. 2008). "Whether the government proved the jurisdictional element [of a statute] is measured as a challenge to the sufficiency of

the evidence." United States v. Key, 76 F.3d 350, 353 (11th Cir. 1996) (per curiam).

Defendant contends that his conviction violates the expanded Helms-Burton Act because it equates to the Government granting protection to Cuban marks. He also asserts that the Government did not offer proof that the marks were "in use" or that their use would result in consumer confusion. We note initially that Defendant did not raise his consumer confusion argument at trial, on his motions for acquittal, or at any length in his initial appellate brief. We need not determine whether Defendant waived this issue, however, because even considering Defendant's argument, the Government presented sufficient evidence of consumer confusion at trial.

To understand the context of Defendant's arguments, some background on the Cuban revolution and eventual embargo imposed by the United States is helpful. See generally Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462 (2d Cir. 2005), and 213 F. Supp. 2d 247 (S.D.N.Y. 2002). Fidel Castro took control of the Cuban government on January 1, 1959. Culbro, 213 F. Supp. 2d at 256. The Castro regime nationalized cigar manufacturers on September 15, 1960. Id. Some of the owners of the appropriated companies fled to the United States

and other countries and reopened their businesses "using the trademarks their families had owned before the government seizure." Id.

The United States imposed an embargo on Cuba in 1963. Culbro, 399 F.3d at 465. The terms of the embargo were set forth in regulations promulgated by the Office of Foreign Assets Control within the Department of Treasury. Id. Those regulations were eventually codified by Congress in 1996 in the Cuban Liberty and Democracy Solidarity Act ("LIBERTAD Act"), Pub. L. No. 104-114, Title I, § 102, 110 Stat. 792 (1996) (codified at 22 U.S.C. § 6032(h)), also known as the Helms-Burton Act. The embargo regulations prevent Cuban cigar companies from selling cigars in the United States. Id. As initially promulgated, however, the embargo did not prevent tobacco companies controlled by the Cuban government from registering trademarks in the United States. See Culbro, 213 F. Supp. 2d at 256; Empresa Cubana Exportadora de Alimentos y Productos Varios v. United States Dep't of Treasury, 516 F. Supp. 2d 43, 47 (D.D.C. 2007). In a series of litigation in the 1960s and 1970s, however, U.S. courts determined that the fleeing families had obtained common law rights to the trademarks prior to the nationalizations. Culbro, 213 F. Supp. 2d at 256. As the rights of the individual owners had been clarified, some families began selling trademark registrations to

U.S. cigar manufacturers.  Id. at 256-57.  Thus, the notion of "parallel brands"

developed.  That is,

> the Cuban government sells a Cuban cigar in Cuba and other parts of
> the world under the same apparent trademark as an unrelated
> company that sells a non-Cuban cigar in the U.S.  It is not the same
> trademark, however, as the U.S. cigars are sold under trademarks
> which the owners had registered and used in the United States for the
> sale of their cigars prior to the expropriation of the Cuban cigar
> companies.

Id. at 257.

The Helms-Burton Act was further amended in 1999 to expand its coverage

to intellectual property rights.[1]  Section 211 of the amendment provides:

> (a)  (1)  Notwithstanding any other provision of law, no
> transaction or payment shall be authorized or approved
> pursuant to section 515.527 of title 31, Code of Federal
> Regulations, as in effect on September 9, 1998, with
> respect to a mark, trade name, or commercial name that
> is the same as or substantially similar to a mark, trade
> name, or commercial name that was used in connection
> with a business or assets that were confiscated unless the
> original owner of the mark, trade name, or commercial
> name, or the bona fide successor-in-interest has
> expressly consented.
>
> (2)  No U.S. court shall recognize, enforce or otherwise
> validate any assertion of rights by a designated national

---

[1]This amendment was enacted on October 21, 1998, in Section 211 of the Omnibus
Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, §
211, 112 Stat. 2681, 2681-88 (1998).  There is no official legislative history of this amendment
which was passed as part of an omnibus appropriations bill and has no particular name.  As the
parties have referred to it as the Helms-Burton Act, we will do so as well for the sake of
consistency.

> based on common law rights or registration obtained under such section 515.527 of such a confiscated mark, trade name, or commercial name.
>
> (b) No U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national or its successor-in-interest under sections 44(b) or (e) of the Trademark Act of 1946 (15 U.S.C. § 1126(b) or (e)) for a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

Id. The import of this legislation is to prohibit Cuban companies from registering "appropriated" trademarks in the United States without permission of the original owner. U.S. courts are also prohibited from recognizing any such rights.

Defendant's theory of the case is that his cigar box replicas were copies of Cuban cigars and trademarks, not those of Altadis and General Cigar Co. Because Cuban marks are not entitled to any protection in the United States, Defendant argues, he cannot have committed a crime by copying Cuban trademarked material. The problem for Defendant is that we have already rejected his defense in a similar case. In United States v. Guerra, 293 F.3d 1279 (11th Cir. 2002), three defendants were indicted for trafficking in counterfeit cigars. Guerra also defended against the charges arguing that his products were meant to copy the Cuban marks and not the United States marks. Id. at 1287. In affirming Guerra's

10

conviction under the terms of 18 U.S.C. § 2320(d), we determined that "it is irrelevant that Guerra did not know the marks were registered in the United States, or thought the marks were only unprotectable Cuban marks." Id. Based on Guerra, therefore, Defendant's theory of Cuban counterfeiting is not available to him.

We reject Defendant's argument that Guerra is no longer good law because it was issued prior to the 1998 amendment of the Helms-Burton Act which purportedly established the idea of the "parallel marks." Defendant's argument with respect to "parallel marks" is premised in his belief that under the Helms-Burton Act, parallel marks are not entitled to protection in the United States. We find, however, that this is not an accurate statement of the law. The Helms-Burton Act provides that no transactions or enforcement of rights of Cuban trademarks can occur under United States law. For this reason, the district court properly instructed the jury that Cuban marks are entitled to no protection in United States courts. This limitation, however, is not extended to a trademark that is properly registered with the United States Patent and Trademark Office by a company incorporated outside of Cuba. The mere fact that the trademarks used by Altadis and the other victims in this case are "parallel" to marks used by Cuban companies for Cuban cigars marketed outside the United States does not mean that the U.S.

11

marks registered by U.S. companies are not protected. Here, testimony at trial demonstrated that the original owners sold their rights to various companies, including Altadis U.S.A. and Cuban Cigar Co. More significantly, however, there is nothing in the Helms-Burton Act which indicates it would apply to a federal criminal prosecution.

Next, Defendant argues to us – as he did in the district court – that his motion for acquittal on sufficiency of the evidence should at least have been granted on Count 3 because the evidence showed that Cohiba Esplendidos and Partagas Lusitania cigars are not sold in the United States and therefore could not be "in use" under the terms of § 2320. Title 18 Section 2320(a) reads:

> Whoever; intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services, or intentionally traffics or attempts to traffic in labels, patches, stickers, wrappers, badges, emblems, medallions, charms, boxes, containers, cans, cases, hangtags, documentation, or packaging of any type or nature, knowing that a counterfeit mark has been applied thereto, the use of which is likely to cause confusion, to cause mistake, or to deceive, shall, if an individual, be fined not more than $2,000,000 or imprisoned not more than 10 years, or both . . . .

Id. See also § 2320(e)(1)(A)(ii) (mark must be "identical with, or substantially indistinguishable from, a mark registered on the principal register in the United States Patent and Trademark Office and in use").

As the district court recognized, Defendant correctly states the law as to these two types of cigars; however, Count 3 also charged Defendant with counterfeiting the Hoyo de Monterrey cigar also produced by General Cigar Co. Because evidence was presented as to the Hoyo de Monterrey cigars, the jury was still entitled to reach a verdict on Count 3 with any question of the number of cigars impacted going to sentencing.

Finally, Defendant asserted at oral argument that the Government did not present sufficient evidence with respect to whether the use was likely "to cause confusion." We note that Defendant did not raise this argument to the district court at trial, although the district court carefully considered the Government's burden of proof on this statutory element. See, e.g., DE152, at 68-71 (district court discussing what type of testimony would be required to demonstrate confusion).

Significantly, during the trial, all parties agreed, based on our prior precedent, that it is not necessary to show proof of confusion through the testimony of consumers or experts or the admission of surveys. See United States v. Torkington, 812 F.2d 1347 (11th Cir. 1987). In Torkington, the defendant was charged with two counts of violating the Trademark Counterfeiting Act of 1984, the same statute at issue in the instant matter. The district court held that

13

§ 2320(d)(1)(A) required a showing that direct purchasers would be likely confused, mistaken or deceived by the allegedly counterfeit goods. Id. at 1349. Because there was an enormous price differential between the counterfeit Rolex watches offered by the defendant and authentic Rolex watches, the district court held as a matter of law that it was unlikely that direct purchasers would be confused.

> We rejected this conclusion and held:

> section 2320(d)(1)(A) does not require a showing that direct purchasers would be confused, mistaken or deceived; rather, the section is satisfied where it is shown that members of the purchasing public would be likely to be confused, mistaken or deceived. Moreover, we find that this likely confusion test includes the likelihood of confusion in a post-sale context.

Id. We further noted that it was a jury question as to whether a direct purchaser would be confused, mistaken or deceived. Id. at 1353 n.8. Thus, we reversed the district court's dismissal of the indictment against the defendant by noting that in addition to the indictment that set forth each element of the crime, "the district court had before it evidence that the allegedly counterfeit watches are externally identical to authentic Rolex watches and bear both the name 'Rolex' and the Rolex crown trademark emblem." Id. at 1354. Several of our sister circuits have reached the same conclusion. See also United States v. Foote, 413 F.3d 1240 (10th Cir. 2005) (extending application beyond direct purchasers); United States v. Hon, 904

14

F.2d 803 (2d Cir. 1990) (same); United States v. Yamin, 868 F.2d 130 (5th Cir. 1989) (same); United States v. Gantos, 817 F.2d 41 (8th Cir. 1987) (same).

Furthermore, we reiterated in Guerra that it was not necessary for a trademark holder to testify before the jury or that the agent who conducted the investigation be qualified as an expert in a particular type of product. 293 F.3d 1279 (11th Cir. 2002). "In this case, the jury had been shown registered designs of the trademarks for each cigar, as well as various cigar labels or bands produced by authorized licensees. The jury therefore had a valid basis for comparison in determining whether the designs were 'identical or substantially identical.'" Id. at 1288.

Here, Defendant was able to assert to the jury – through his own testimony, and Mr. Artz's, as well as the arguments of his counsel – that he was merely mimicking Cuban cigar brands. This activity was not illegal, Defendant averred to the jury, because Cuban trademarks do not receive protection in the United States. The Government argued to the jury that Defendant's cigar boxes were not replicas of Cuban brands, but rather were confusingly similar to trademarks and artwork registered by U.S. corporations with the United States Patent and Trademark Office. Numerous witnesses testified about the appearance of the boxes and the jury had the boxes in the jury room. According to its verdict, the jury ultimately

concluded that Defendant's cigar boxes were likely to cause confusion with the American brands. Defendant does not – and cannot argue – that the jury's conclusion is contrary to the weight of the evidence presented.

## B. Jury Instructions

We review the district court's refusal to give a requested jury instruction for abuse of discretion. United States v. Richardson, 532 F.3d 1279, 1289 (11th Cir. 2008). A refusal to give a requested instruction is an abuse of discretion if: (1) the requested instruction is correct, (2) the court did not address the substance of the instruction in the charge, and (3) the failure to give the instruction seriously impaired the defendant's ability to present an effective defense. Id.

During the charge conference, the parties debated whether it was necessary for the court to instruct the jury on the Cuban embargo as well as "parallel marks." The court ultimately gave the jury the following instructions:

> Title 18 United States Code, Section 2320(a) makes it a Federal crime or offense for anyone to traffic in counterfeit goods or services.

> For you to find the Defendant guilty of these crimes alleged in Counts 1 to 3, you must be convinced that the government has proved on the date alleged in each of the following beyond a reasonable doubt:

> First: That the Defendant trafficked, or attempted to traffic, in goods, that is cigars.

16

Second:      That such trafficking, or attempt to traffic, was intentional;

Third:      That the Defendant knowingly used a counterfeit mark on, or in connection with, those goods; and

Fourth:      That the use of the counterfeit marks was likely to confuse the purchasing public to cause mistake, or to deceive. The likely confusion test includes the likelihood of confusion in a post-sale context.

The term "traffic" means to transport, transfer, or otherwise dispose of, to another, for common commercial advantage or financial gain.

See DE95, at 7.

The court instructed the jury on "Counterfeit Mark" as:

A "mark" is a word, name, symbol, or device, or any combination thereof, used to identify and distinguish goods and to indicate their source. A mark used on or in the sale of goods is known as a trademark. A certificate of registration from the United States Patent and Trademark Office is initial evidence of the validity of the registered mark, of the ownership of the mark, and of the owner's exclusive right to use the registered mark. That is, such a certificate is sufficient proof of the existence of a valid registered mark unless outweighed by other evidence in the case.

A mark need not be absolutely identical to be considered counterfeit.

A "counterfeit mark" is a mark that is spurious, or not genuine or authentic and is identical with, or substantially indistinguishable from, a mark in use and registered for those same goods or services on the principal register in the United States Patent and Trademark Office. In order for the mark on the goods at issue to be genuine, it

17

must be placed there by the legitimate owner of the mark or with the owner's authorization. The genuine mark must not only be federally registered, but must also be in actual use at the time of the defendant's use of that mark. Finally, a counterfeit mark is a mark the use of which is likely to confuse the purchasing public.

For you to find that the genuine marks were "in use," the Government must prove, beyond a reasonable doubt, that the genuine marks were actually being used during the period of the offense by the genuine mark holder on or in connection with the goods or services for which the genuine marks are registered. Evidence of such use may, but need not, include testimony that the mark appears on every good; advertisement depicting the mark and its goods or services; or legal action to enforce trademark rights.

See id. at 8.

The court described "Cuban marks" as:

United States trademark law does not protect Cuban trademarks. However the law prohibits actions that deceive consumers and impact a producer's goodwill through the deceptive and misleading use of protected marks. The Government has the burden to prove that the use of the counterfeit of the protected marks is likely to confuse the purchasing public. The Government also has to prove that the defendant intentionally dealt in goods and knowingly used a counterfeit of a protected mark in connection with those goods. The government does not have to prove that the defendant knew the law. What the government must prove is that he intentionally trafficked in goods knowing that the goods are counterfeit.

See id. at 11. At Defendant's request, the court specifically agreed to add the word "protected" throughout the "Cuban marks" instruction. At the charge conference, Defendant conceded that the court's addition of the word "protected"

18

mooted his request for a charge on the Cuban embargo. *See* DE158, at 131-34.[2]

Because of this concession before the district court, we do not consider any arguments made by Defendant with respect to the Cuban embargo instruction.

On appeal, Defendant argues that the district court abused its discretion in refusing to give his proffered instruction on "parallel marks." Defendant's argument with respect to "parallel marks" is premised in his belief that under the Helms-Burton Act, parallel marks are not entitled to protection in the United States. We found above, however, that this is not an accurate statement of the law. The mere fact that the trademarks used by Altadis and the other victims in this case are "parallel" to marks used by Cuban companies for Cuban cigars marketed outside the United States does not mean that the U.S. marks registered by U.S. companies are not protected. Once this defense theory is recognized and rejected, the issue of jury instructions is more readily analyzed.

---

[2]Defendant had requested a charge on the Cuban Embargo which stated:
> The Court has determined and instructs you as a matter of law that the sale of Cuban cigars is illegal in the United States but not in other countries and that trademarks in which Cuba has an interest are not protectable under United States law.

See Appellant's Brief, at 11. He also wanted a charge on "Invalid Cuban Marks":
> In this case the defendant contends that the alleged counterfeit mark used on the cigars was invalid as a Cuban trade mark. The defendant has the burden of proving by a preponderance of the evidence that the alleged counterfeit mark is a Cuban trade mark.
> If you find by a preponderance of the evidence that the alleged counterfeit mark was a Cuban mark, your verdict should be for the defendant.

Id.

The court denied Defendant's requested instruction on "parallel marks"

which read:

> The defendant contends that the alleged counterfeit marks are parallel marks and that the packaging of cigars in [sic] inherently distinctive and identified the cigars as Cuban cigars with Cuban marks. The defendant has the burden of proving by a preponderance of the evidence that the alleged counterfeit marks are parallel marks. Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that the counterfeit marks are parallel marks.
>
> If you find by a preponderance of the evidence that the counterfeit mark is distinguished from the United States protected trademark, you must find the defendant not guilty.

See DE103.[3]

The court did offer, however, to give an instruction directly from the case

Defendant cited – Culbro, 213 F. Supp. 2d 247 – which provided:

> "parallel brands" developed, i.e., the Cuban government sells a Cuban cigar in Cuba and other parts of the world under the same apparent trademark as an unrelated company that sells a non-Cuban cigar in the U.S. It is not the same trademark, **however, as the U.S. cigars are sold under trademarks which the owners had registered and used**

___

[3]Defendant had also proposed a written instruction on the definition of parallel trademarks which read:

> The court has determined and instructs you as a matter of law that parallel trademarks are not protected by United States law. In this case parallel trademarks means those marks which the Cuban government sells in Cuba and other parts of the world under the same apparent trademark as another company that sells a non-Cuban cigar in the United States. They are not the same trademarks.

See Appellant's Brief, at 10.

**in the United States for the sale of their cigars prior to the expropriation of the Cuban cigar companies**.

Id. at 256-57 (emphasis added). Defendant, however, would only agree to that instruction if the court did *not* read the portion in bold. See DE158, at 114-16. The court refused to give a partial definition but offered to Defendant that the court would consider any other definition of "parallel marks" that Defendant could locate. Id. at 115-34. Defendant did not provide any.

As we have discussed above, there is no dispute that the concept of parallel marks exists. However, the fact that marks can be described as "parallel" does not mean that the marks registered in the United States by U.S. companies are not due any protection. The Government elicited testimony at trial that the marks used by Altadis and General Cigar Co. were traced to those used by the individual families that left Cuba and came to the United States after the Cuban government nationalized the cigar industry. DE152, at 4-5, 38-39. We disagree with Defendant's assertion that because one of the American companies holding the trademarks is a subsidiary of a corporation partially owned by the Cuban government, the American company would not be entitled to trademark protection under Helms-Burton. Further, the instructions given by the district court made it

clear that Cuban trademarks are not protected in the United States. Thus, the jury was only comparing Defendant's cigar boxes to the American trademarks.

We conclude that Defendant's proffered "parallel marks" instruction was not a complete statement of the law because it omitted a portion of the statement made by the district court in Culbro. Further, we find that Defendant was adequately able to argue his theory of defense to the jury without a "parallel mark" instruction.

## C.    Prosecutorial Misconduct/Closing Arguments

"In reviewing claims of prosecutorial misconduct, 'we must assess (1) whether the challenged comments were improper; and (2) if so, whether they prejudicially affected the substantial rights of the defendant.'" United States v. Miranda, 279 Fed. Appx. 950, 951-52 (11th Cir. 2008) (per curiam) (quoting United States v. Arias-Izquierdo, 449 F.3d 1168, 1177 (11th Cir. 2006)). As Defendant's counsel objected to the comments at trial, the standard of review is de novo. United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006).

In its initial closing, the Government argued that although Defendant used boxes and labels designed to look like "Cuban" cigars, the names, symbols, and artwork Defendant used were identical to or substantially indistinguishable from the U.S. trademarks. Defendant's attorney argued in his closing that copying Cuban cigars and marks was not a crime because Cuba had no rights in the United States. Defendant's attorney also implied that Altadis U.S.A. was a puppet of the Cuban government and that the Cuban government was behind Altadis U.S.A.'s registration of marks in the United States and behind the prosecution of Defendant. Specifically, Defendant's counsel stated:

> This is not about U.S. trademarks. Let me tell you how you know that. You have to analyze, look at the big picture . . . . What is the big picture here?
>
> The big picture is easy. These guys are the little puppets of Altadis. Who is Altadis? Altadis is fifty percent business partner of the Cuban Government.
>
> What were they looking for? They were trying to figure out a way around U.S. laws to figure out how they could protect Cuban trademarks. That's really what this is all about.

See DE151, at 11.

In its rebuttal closing, the Government responded to defense counsel's assertions that Defendant did not commit a crime because Cuba had no rights in the United States. The Government argued that if Defendant's interpretation were

23

correct, if a country such as Cuba or Venezuela decided to copy a McDonald's trademark, then anyone in the United States could open a McDonald's (without authorization from the company) by contending it was legal to do so because he was just copying the Cuban or Venezuelan McDonald's and not the U.S. McDonald's. In response to defense counsel's comments about Altadis U.S.A., the Government stated that the case was not about the Cuban embargo and that the jury would be receiving no instructions on the Cuban embargo. Rather, the jury was only to determine whether Defendant violated 18 U.S.C. § 2320(a). Specifically, Mr. Gilfarb, the prosecutor, stated:

|  | I think Burger King used to have the phrase, have it your way. The defendant cannot have it his way. He can't have it his way because the argument is that if Cuba or any other nation decides to ignore our laws about what is protected then anyone here in the United States can copy that – |
| --- | --- |
| MR. HERRERA: | Objection. |
| THE COURT: | Grounds? |
| MR. HERRERA: | Inconsistent with the law and facts. |
| THE COURT: | Overruled. What the lawyers say is not the law nor is it the facts. It's what they think the facts are. And the law I will give you the law. You will decide what the facts are. |
| MR. GILFARB: | Now Cuba decides it's going to have a McDonalds – |
| MR. HERRERA: | Objection, Golden Rule. |
| THE COURT: | Overruled. |
| MR. GILFARB: | Then somebody in Hialeah says I am going to have a McDonalds too, so it's the Cuban |

24

|  |  |
|---|---|
|  | McDonalds.  Then you have Hugo Chavez who decides he wants a McDonalds in Venezuela – |
| MR. HERRERA: | Objection.  This is Golden Rule. |
| THE COURT: | Overruled. |
| MR. GILFARB: | How long will that go on before U.S. trademark law means nothing.  That is the defendant having it his way.  U.S. law would mean nothing in the end.  This defendant stole what Castro couldn't.  Reached into the United States and stole what Castro could not. |

> Stole from these expatriates their reputations and their names.  That Altadis, S.A., the parent company to one of the victims, only one of the victims – by the way, if you decide to for some reason ignore Altadis as the victim what is the defense to General Cigar that Altadis, S.A. is violating the embargo because it's a Spanish corporation not subject to the jurisdiction here that has a subsidiary company that is victim to a company that violates the embargo?  Despite that the U.S. Government granted them protection, the protection of the Patent and Trademark Office.  That doesn't make sense.  Just because a company that does business here has a parent that does business with Cuba that violates the embargo.  There is not going to be an embargo instruction.  You will be instructed on the law relevant to this case.  There's no embargo instruction.

See DE151, at 20-22.

We do not find the prosecutor's remarks to be improper.  Throughout the

trial, Defendant's counsel referred to the situation in Cuba and accused the

Government of siding with Fidel Castro and protecting Cuban trademarks.  He

also repeatedly argued that the Government was going after the "little guy" and protecting companies owned by the Cuban government. The Government's comments were in direct response to Defendant's assertion that a guilty verdict would be tantamount to supporting the Cuban government.

Even if we did find the comments to be improper, we would not find that they prejudicially affected the substantial rights of the defendant. Upon objection of defense counsel, the district court reminded the jury that the comments of the lawyers reflect neither the law nor the facts. Both the Government and Defendant were able to press their theories to the jury. The Government argued that Defendant was copying the trademarks of U.S. companies; Defendant argued he was copying Cuban trademarks which are not afforded protection in the United States. With this issue squarely presented to the jury, nothing in the rebuttal argument of the Government prejudiced Defendant's right to have the jury consider his theory of the evidence. We do not find there is a reasonable probability that but for these remarks, the outcome of the trial would have been different.

## III. Conclusion

For the above-stated reasons, we AFFIRM Defendant's convictions and sentence.