[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-13161
_____

D.C. Docket No. 8:08-cr-00450-VMC-EAJ-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CARL BLAIR,

Defendant-Appellant.

_____

No. 10-13383
_____

D.C. Docket No. 8:08-cr-00450-VMC-EAJ-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DENEIL TENASHEL CAMPBELL,

Defendant-Appellant.

_____

No. 10-13397

_____

D.C. Docket No. 8:08-cr-00450-VMC-EAJ-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GEORGE AUGUSTUS,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(October 24, 2012)

Before HULL, MARCUS, and HILL, Circuit Judges.

PER CURIAM:

Defendants George Augustus, Carl Blair, and Deneil Tenashel Campbell

appeal their convictions for (1) conspiring to possess with intent to distribute

cocaine and (2) carrying a firearm during and in relation to, and possessing a

firearm in furtherance of, a drug-trafficking offense.  After review and oral

2

argument, we affirm.

## I. BACKGROUND

The defendants' convictions stem from an investigation by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") that was nicknamed the "Blair Chopper Project."  The ATF commenced the investigation in June 2008, after learning that Defendant Blair was selling drugs and firearms.  ATF Special Agents Brian Neal and Richard Zayas purported to be partners in a firearms- and drug-trafficking organization, while Agent Chad Horst posed as Agent Neal's nephew, who worked for the organization.

That September, 2008, Defendants Augustus, Blair, and Campbell, along with a fourth co-defendant named Antonio McClain, were arrested and subsequently charged by superseding indictment with conspiring to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846 (Count 1), and carrying a firearm during and in relation to, and possessing a firearm in furtherance of, the § 846 violation, in violation of 18 U.S.C. §§ 924(c)(1) and 2 (Count 2).  In Counts 3 through 7, Defendant Blair was charged with distributing and possessing with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) (Count 3), and possessing a firearm and ammunition as an illegal alien on four separate

3

occasions, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2) (Counts 4 through 7). Defendant Blair pled guilty to Counts 3 through 7.

On February 8, 2010, the trial began as to all defendants on Counts 1 and 2. The jury convicted Defendants Augustus, Blair, and Campbell, but acquitted McClain. We recount the trial evidence, which included testimony by ATF agents and recorded conversations between the agents and the defendants.

## A.    Commencement of the ATF Investigation

The ATF initially interacted with Defendant Blair on June 10, 2008, when a confidential informant introduced undercover ATF Agent Horst to Blair. Agent Horst had planned to purchase a firearm from Blair. The sale, however, did not take place that day because Blair was unable to obtain a firearm. Agent Horst and Blair agreed to meet another day to complete the sale. At Blair's request, Horst gave Blair his telephone number.

From June 11 to June 25, Agent Horst and Defendant Blair spoke numerous times and exchanged text messages about Blair selling firearms and drugs to Horst. On June 25, 2008, Blair met with Agent Horst and undercover ATF Agents Neal and Zayas, and sold them 446.6 grams of marijuana. Blair and the agents also discussed future drug and firearm transactions.

After the meeting ended, Blair told Agent Horst that he would contact his

4

supplier to obtain cocaine for Horst to purchase.  In earlier conversations, Blair had mentioned that he owned a car-detailing business.  Blair now stated that he could steal his customers' cars to make money and could also break into his customers' homes and steal any firearms found inside.

The following day, June 26, 2008, ATF agents observed Defendant Blair meet Defendant Augustus.  Later that day, Blair met with Agents Horst and Neal and sold them a firearm for $500.[1]  Blair and the two agents also discussed future drug and firearm transactions.

Over the next few days, Defendant Blair and Agent Horst conversed over the telephone.  On June 30, 2008, Blair met again with Agents Horst and Neal, and sold two firearms to them for $1200, plus a $60 broker fee.  Blair mentioned that he had an automatic machine gun available for $1500.

On July 15, 2008, Defendant Blair met Agents Horst and Neal to sell the machine gun.  Blair, however, produced a different firearm, which had a lower street value than the machine gun.  To make up the difference, Blair agreed to supply drugs or another firearm.

**B.    Initial Discussion of the Stash House Robbery**

---

[1]The government introduced this firearm, as well as several other firearms discussed at trial, as exhibits.

On July 28, 2008, Blair fulfilled his earlier promise by giving Agents Neal and Zayas a semi-automatic handgun.  During the meeting, Agent Zayas complained about "this guy" who had not paid for drugs that Zayas had supplied. Blair asked whether Agent Zayas wanted to "kill" him, but Zayas stated he wanted only to blow up his car.

Agent Zayas then asked whether Blair knew anyone who could provide him with an explosive.  Blair responded that an explosive was not necessary because he had "goons" who could beat the man up.  After Agent Zayas repeated his interest in only the explosive, Blair called one of his "goons," who told him that he would not be able to secure an explosive.

Nonetheless, Blair told Agent Zayas, "Yeah, me and him go take care of it 'cause I like shit like that, mask on[,] put my suit on, do what I gotta do."  Blair added that his goon would want $1000 for the job and that they could "kill him too."  Agent Zayas explained that he did not want his buyer dead because that would make it impossible to obtain payment.

Instead, Agent Zayas suggested "jack[ing]" the buyer, which he later testified was a street word for committing a robbery.  Blair asked how much money the buyer had, and Agent Zayas stated that the buyer had a lot of "dope"—30 to 40 kilograms of cocaine—in a house.  Blair asked if the agents

6

wanted Blair and his goons to get the cocaine, but Agent Zayas stated he needed to think about the offer. Agent Zayas testified that he wanted to reassess the situation. When Agent Zayas expressed doubt over whether Blair and his "guys" knew what they were doing, Blair reassured him that they were "killers" and that he would arm himself with an SKS rifle equipped with a dagger.

As the agents departed, Blair asked them to let him know about their plans because he needed money to pay a debt owed for a marijuana purchase. Later that day, Agent Zayas called Blair and confirmed that he wanted Blair and his goons to rob the stash house. Agent Zayas explained that he would order .5 to .75 kilogram of cocaine from his contact at the stash house and then would give Blair the address. Agent Zayas emphasized that it would be a difficult robbery because at least three people would be at the stash house with firearms. Blair also asked if there would be money in addition to the cocaine, but Agent Zayas told him that he could not guarantee it. Blair stated that although he might not participate in the actual robbery, he would have some of his goons do it. Agent Zayas and Blair agreed to meet the next day.

## C.    Planning of the Stash House Robbery

On July 29, 2008, Agent Neal and Agent Zayas met Defendant Blair and then traveled together to meet Defendant Augustus, whom Blair called "one of my

7

goons." Blair explained that he had called Augustus the day before about the explosive device and that Augustus was experienced with robbery. Blair stated that after they divided up the cocaine from the stash house, he might have to ask the agents or Augustus for help selling it, although Blair added that he had connections.

At the meeting with Defendant Augustus, which was also attended by a man named Hugh McCalla, Agent Zayas started to discuss the robbery, but then explained that he would not continue the discussion unless that was what Augustus wanted. Defendant Augustus replied that he was concerned only about protecting his "people" and the agents' "people and family," and asked, "So what it works[?]" Agent Zayas testified that he understood Augustus to be asking about the robbery plan. After Agent Zayas explained that he had ordered one kilogram of cocaine, Augustus requested the stash house's location so he could conduct surveillance before the robbery. Agent Zayas responded that his contact would not tell him the address until just before the pick up, as the cocaine was routinely transferred to different locations.

Defendant Augustus then asked about the quantity of cocaine stored inside the stash house, and acknowledged that he "already kn[ew] [the occupants are] strapped." Defendant Blair added, "We have to orchestrate it." When Agent

8

Zayas expressed doubt over whether they were serious about the robbery, Augustus dismissed his concern, stating, "That's like taking candy from a baby." Agent Zayas asked if Augustus was "straight," to which Augustus replied, "Yeah, we straight." Agent Zayas testified that he had asked Augustus this question to offer him an opportunity to back out of the robbery.

The conversation then turned to how to divide the cocaine. Defendant Blair suggested that he would be "happy" to receive a share of five kilograms. Defendant Augustus told Blair, "[Y]ou're supposed to pay me when you finish."

The robbery was delayed because Defendant Augustus was out of town for a funeral. On August 22, 2008, Augustus met Defendant Blair at a location where Blair had arranged to sell Agent Horst a machine gun. After the agents arrived, Blair got into the undercover vehicle and showed Agent Horst the purported machine gun. Agent Horst did not purchase it, however, because it was not actually a machine gun. During that meeting, Blair told Agent Horst that Augustus supplied him with firearms. Blair left the location with Augustus in Augustus's car.

On September 16, 2008, Agent Zayas and other undercover ATF agents met with Defendant Augustus and Hugh McCalla. Regarding the planned robbery, Augustus told the agents that "you all can sit and chill, we do the work." When

9

Agent Zayas inquired whether Augustus and McCalla were the only ones executing the robbery, Augustus replied that he was unsure because McCalla was reluctant to go. Augustus stated that he was trying to find a driver for the robbery because his license was suspended. When Agent Zayas mentioned that he could cancel his cocaine order if Augustus was not ready, Augustus emphasized that he was "[r]eady dog, ready."

After discussing the robbery plan with Defendant Augustus, Agent Zayas suggested that, to execute the plan, they meet at 1:45 PM the next day at the Smokey Bones restaurant. Augustus reiterated that he and his "guys" would be ready and warned that the promised quantity of cocaine had better be at the stash house. Agent Zayas assured him that it would. After further discussion, Agent Zayas told Augustus that "you gotta be ready to go," and asked twice if "[w]e straight," to which Augustus answered twice, "Yeah man." Augustus agreed with Agent Zayas's proposal to split the cocaine evenly and indicated he would be able to "[u]nload[]" his share.

**D.    The Attempted Robbery and the Defendants' Arrest**

On September 17, 2008, Agent Zayas called Defendant Augustus to confirm the plan and their meeting time at the restaurant. Around noon, Augustus called Agent Zayas and explained that he was waiting for his ride and needed gloves and

10

tape for the robbery, but had the rest of the "stuff."

A few minutes before 1:45 PM, Defendants Augustus, Deneil Tenashel Campbell, and Antonio McClain arrived at the restaurant in a gold Pontiac vehicle that Campbell had borrowed from his girlfriend. McClain was driving,[2] Campbell sat in the front seat, and Augustus sat behind McClain. Agents Horst and Neal, who had parked earlier at the restaurant, exited their car and approached the gold Pontiac. Agent Neal stood beside the rear window, while Agent Horst stood on the driver's side of the car.

Agent Neal told Defendants Augustus, Campbell, and McClain that they were waiting for Agent Zayas to go to the stash house to pick up the kilogram of cocaine as planned. Agent Neal also said that Agent Zayas expected that 25 kilograms of cocaine were stored at the house. Augustus confirmed that he knew about the 25 kilograms, but noted that they had only one "pistol" with them and asked how many people were in the house. Agent Neal answered that there were two. Campbell asked if the two occupants were "Cubans" and would be "strapped," and Agent Neal said they were Puerto Ricans and would be armed.

After Agent Neal asked if the defendants were "straight," Augustus replied,

---

[2]McClain, who testified at trial, stated that Augustus had asked him earlier that day if he wanted a ride, and then asked him to drive. McClain testified that he agreed because he liked to drive.

11

"Yeah we're straight . . . ."  Agent Neal testified he understood his answer to mean the defendants were ready to commit the robbery.  When Agent Neal also asked, "Everybody up for that shit?" Defendant Campbell nodded his head affirmatively.  Agent Neal tapped Defendant McClain on the shoulder and asked Augustus if McClain was "cool with it."  Augustus said "yeah," and McClain nodded affirmatively.[3]

Defendant Augustus also asked whether the agents had any firearms with them.  Agent Neal said no; he later told Agent Horst that he feared Augustus wanted to borrow a firearm.  Augustus stated that they planned to wait for Agent Zayas to exit the stash house before they went inside to rob it.  Following the robbery, they were to go to a storage facility to divide the cocaine.

After receiving confirmation that Agent Zayas was ready to proceed, Agent Neal told the defendants to follow Agent Horst and him to meet Agent Zayas at the storage facility, before proceeding to the stash house.  Following behind the agents' car, Defendant McClain drove the gold Pontiac with Augustus and Campbell inside.[4]  ATF agents arrested Defendants Augustus, Campbell, and

---

[3]McClain testified that he had not been paying attention to the conversation and nodded only because an agent knocked on the window.

[4]McClain testified that Augustus told him to follow the agents because they were moving to avoid the heat.

McClain at the storage facility.

After Augustus, Campbell, and McClain were removed from the vehicle and handcuffed, they were seated on the ground several yards from each other. ATF Special Agent Daniel O'Kelly testified that standard procedure required that any weapons or personal effects, removed from a suspect during a patdown, be placed a safe distance away from the suspect. According to Agent O'Kelly, while at the arrest scene, he observed a kitchen knife and plastic lighter on the ground next to Campbell. Before taking the knife as evidence, Agent O'Kelly used it to cut off McClain's plastic handcuffs. Agent O'Kelly testified that he was not positive that the knife was Campbell's; Agent Horst testified that he later found out that a knife was recovered from Campbell.

Meanwhile, ATF Special Agent Michael Coad searched the defendants' gold Pontiac. Agent Coad found two bags inside the trunk. The larger bag contained a black mask and a black shirt, and the smaller bag contained a loaded pistol. Agent Coad did not find any other weapons.

After the arrests, ATF agents placed Defendants Augustus, Campbell, and McClain in the back of a police patrol car and recorded their conversation, which was partly in Patois, a Jamaican broken-English dialect. Augustus speculated that, during their interactions with the agents, someone must have been "on wire."

13

However, the defendants concluded that the agents "have nothing" and "[i]f them never find the gun, it would have been a different thing." Augustus stated that "[t]hey not catch us with any thing. They catch us with conspiring to do it." Campbell told Augustus that "make sure they don't have you on a no . . . speaker talking. That's the biggest thing, man, because you on the phone." Campbell also asked Augustus whether the gun was "dirty" and if he had "wipe[d] it off decent." Augustus said he wiped the gun off with "the black shirt."

ATF agents arrested Defendant Blair that same day.

## C.    Conclusion of Trial and Sentencing

After the government's case-in-chief, the four defendants moved for judgment of acquittal. The district court denied their motions. Augustus and Blair then rested. After Campbell admitted an exhibit, he also rested. McClain called six witnesses in his defense, including himself, before resting. The defendants all renewed their motions for judgment of acquittal, which the court denied.

The district court instructed the jury on the elements of the two charged offenses and the government's burden of proof. The court explained that "[t]he law does not require a defendant to prove innocence or to produce any evidence at all; and if a defendant elects not to testify, you cannot consider that in any way during your deliberations." In addition, the court directed the jury to consider

14

separately the evidence for each count and against each defendant.

The jury found Defendants Augustus, Blair, and Campbell guilty on both Counts 1 and 2, but acquitted McClain on all counts. The district court sentenced Augustus to 168 months' imprisonment on Count 1, followed by 60 months' imprisonment on Count 2, for a total of 228 months. The court sentenced Campbell to 235 months' imprisonment on Count 1, followed by 60 months' imprisonment on Count 2, for a total of 295 months.

The court sentenced Blair to 170 months' imprisonment on Count 1, 60 months' on Count 3, and 120 months' on Counts 4 through 7, all to run concurrently, followed by 60 months' imprisonment on Count 2, for a total of 230 months. The defendants do not appeal their sentences.

## II.  DISCUSSION

### A.    Campbell's Motion for Judgment of Acquittal

Campbell argues that the district court erred by denying his motion for judgment of acquittal as to the cocaine conspiracy charge in Count 1[5] because there was no evidence that Campbell knew about the conspiracy.[6]

---

[5]Campbell presents no argument regarding the § 924(c) firearm conviction and thus has abandoned his challenge to it. See United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998) (holding that a defendant abandons an issue by failing to offer argument on it).

[6]This Court reviews de novo the district court's denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the government and making all

15

To prove the conspiracy offense, the government had to establish: (1) an agreement existed between two or more persons to possess and distribute cocaine; (2) Campbell knew of the goal of the conspiracy; and (3) Campbell knowingly joined or participated in the conspiracy.  United States v. Matthews, 168 F.3d 1234, 1245 (11th Cir. 1999).  Because "conspiracies are secretive by nature, the existence of the agreement and the defendant's participation in the conspiracy may be proven entirely from circumstantial evidence," which includes "inferences drawn from the participants' conduct."  United States v. U.S. Infrastructure, Inc., 576 F.3d 1195, 1203 (11th Cir. 2009).

Viewed in the light most favorable to the government, the evidence was sufficient to sustain Campbell's cocaine conspiracy conviction.  Campbell provided the car that he, Augustus, and McClain used for transportation to the robbery.  During the September 17 discussion with the agents prior to the robbery, Campbell was present when Agent Neal stated that 25 kilograms were stored at the house and that he had ordered one kilogram of cocaine as planned.  Further, during that same discussion, Campbell inquired whether the house's occupants

---

reasonable inferences and credibility choices in favor of the jury's verdict.  United States v. Descent, 292 F.3d 703, 706 (11th Cir. 2002).  To uphold the denial of the motion, we must determine "that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt."  Id. (internal quotation mark omitted).

16

would be armed and whether they were "Cubans," which shows Campbell knew about and expressed interest in the plot to rob the stash house. Indeed, Campbell affirmatively nodded his head in response to Agent Neal's question, "[e]verybody up for that shit?" And, in the post-arrest conversation in the police vehicle, Campbell asked Augustus whether the pistol in the trunk of the gold Pontiac had been wiped clean. Based on the evidence at trial, a reasonable jury could have found that the government had proven beyond a reasonable doubt that Campbell was guilty of the cocaine conspiracy offense.

**B.    Augustus's Motion to Suppress Evidence**

Before trial, Augustus moved to suppress the evidence that ATF agents discovered in the trunk of the gold Pontiac. After a hearing on Augustus's motion, the magistrate judge issued a report recommending that the district court deny the motion. Augustus did not object to the report. Subsequently, the district court adopted the magistrate judge's report and denied Augustus's motion to suppress.

Augustus now argues that the district court erred by denying his motion to suppress this evidence. Federal Rule of Criminal Procedure 59(b)(2) provides that a defendant's failure to file specific written objections to a magistrate judge's report within fourteen days after being served with the report constitutes a waiver of his right to appellate review. Fed. R. Crim. P. 59(b)(2). Augustus failed to

17

object to the magistrate judge's report.  Accordingly, we conclude that Augustus

has waived his right to challenge the district court's order denying his motion to

suppress.

## C.    Augustus's and Campbell's Motions to Sever

Prior to trial, Campbell moved to sever his trial from Blair's and Augustus's

trial.  Although McClain moved to adopt Campbell's motion, Augustus did not.

The district court denied these motions.

On appeal, both Augustus and Campbell contend that the district court

abused its discretion by not severing their trials from Blair's trial, pursuant to

Federal Rule of Criminal Procedure 14.[7]  Specifically, Augustus and Campbell

assert that the trial evidence solely about Blair, such as the marijuana and firearms

sales forming the basis of Counts 3 through 7, resulted in compelling prejudice

that compromised their right to a fair trial.

Rule 14 provides that the district court "may . . . sever the defendants' trials,

or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  If the

---

[7]This Court reviews for abuse of discretion a district court's denial of a motion for severance.  United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007).  We note that Augustus did not join in Campbell's motion to sever, making plain error review the appropriate standard for Augustus's claim.  See United States v. Hill, 643 F.3d 807, 832 (11th Cir. 2011).  However, we need not separate out Augustus's claim from Campbell's claim, because under either standard of review, we conclude the district court did not err in denying the severance motion.

district court does not sever the defendants' trials, the defendants have the "heavy burden" of showing "compelling prejudice" from the joint trial. United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007). "It is well settled that defendants who are indicted together are usually tried together," and this principle "is particularly true in conspiracy cases." Id. Thus, this Court is "generally reluctant to second-guess the district court's decision on severance." Id.

To determine whether the district court's denial of severance should entitle Campbell and Augustus to a new trial, we apply the two-step test established by the Supreme Court in Zafiro v. United States, 506 U.S. 534, 538-39, 113 S. Ct. 933, 938 (1993). First, Campbell and Augustus must demonstrate that the joint trial prejudiced them individually. Id. If they meet that step, they each must then show that severance is the proper remedy for that prejudice. Id. This is because Rule 14 does not dictate severance, but instead "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Id.; see also United States v. Blankenship, 382 F.3d 1110, 1122-23 (11th Cir. 2004). The Supreme Court emphasized in Zafiro that "a district court should grant severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539, 113 S. Ct. at 938.

19

Here, Augustus and Campbell have not shown how the joint trial prejudiced them individually.  The evidence relating to Blair, such as Blair's recorded statements about stealing his customers' cars or Blair's marijuana and firearms sales, was not gruesome or so inflammatory as to prevent the jury from fairly considering the evidence against Augustus and Campbell.  Furthermore, the district court gave a limiting instruction to the jury to consider separately both the evidence for each count and the case of each defendant, and we presume the jury follows the district court's instructions and evaluates the evidence against each defendant individually.  United States v. Walser, 3 F.3d 380, 387 (11th Cir. 1993).  That this jury actually followed the district court's instructions is evidenced by the fact that the jury acquitted McClain on all counts.  See United States v. York, 428 F.3d 1325, 1334 (11th Cir. 2005) (explaining the district court did not abuse its discretion in denying motion to sever where the court instructed the jury to consider each count separately and where "the jury acquitted [the defendant] on two of the thirteen counts"); United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997) (rejecting defendant's argument that the district court abused its discretion in denying his motion to sever, and noting the jury verdict, which acquitted one co-defendant on all counts and acquitted the other co-defendant on eight counts, evidenced that the jury followed the district court's instructions).

20

Also, this trial involved only four defendants, who were all charged with the same two offenses. These factors reduced the possibility of jury confusion. See Blankenship, 382 F.3d at 1124 (discussing the possible appropriateness of severance where the "sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently"). In light of the ample evidence against Augustus and Campbell, the court's jury instructions, and the acquittal of McClain, we conclude that the district court did not abuse its discretion in denying the motion to sever.

**D.    Evidentiary Issues**

This Court reviews the district court's evidentiary rulings for clear abuse of discretion. United States v. Smith, 459 F.3d 1276, 1295 (11th Cir. 2006). This Court reviews constitutional claims de novo. United States v. Williams, 527 F.3d 1235, 1239 (11th Cir. 2008).

1.    Admission of Evidence Regarding Counts 3 Through 7

Blair argues that the district court abused its discretion in admitting evidence of events prior to July 28, 2008, including the unrelated marijuana and firearms transactions and Blair's statements about stealing cars and breaking into

21

houses.  Blair asserts that this evidence, which formed the basis of Counts 3 through 7, should have been excluded under Federal Rule of Evidence 403 because it was unfairly prejudicial, confused the issues, and misled the jury.[8]  We disagree.

Pursuant to Rule 403, a district court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  Fed. R. Evid. 403.  The exclusion of evidence under Rule 403 is an extraordinary remedy, and thus a district court should use the Rule to exclude "only sparingly."  Smith, 459 F.3d at 1295.  Accordingly, this Court views the challenged evidence "in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact."  Id. (internal quotation mark omitted); see also United States v. Bradberry, 466 F.3d 1249, 1253 (11th Cir. 2006) ("Only if the decision to admit evidence over a Rule 403 challenge is unsupportable when the evidence is viewed in the light most supportive of the decision will we say that the decision constitutes an abuse of discretion." (internal quotation marks omitted)).

---

[8]We reject the government's argument that part of Blair's claim should be reviewed for plain error because Blair did not object on the grounds of jury confusion or misleading the jury. Blair, in fact, did raise those objections under Rule 403.  Thus, we review Blair's entire evidentiary claim for abuse of discretion.

The probative value of the challenged evidence here was significant. Blair's statements and actions provided context for the charged offenses, and also explained the origin and development of Blair's and Augustus's relationship with the ATF agents. Specifically, Blair's statements that he needed money to pay off a marijuana debt and could steal his customers' cars and firearms explained his interest in the stash house robbery discussed with Agent Zayas. Nor was the prejudicial impact of this evidence, if any, unfair. The pre-July 28, 2008, evidence helped explain and make believable Blair's willingness to commit a dangerous robbery. Accordingly, the probative value of this evidence was not substantially outweighed by any unfair prejudicial impact of this evidence, as Rule 403 requires.

Moreover, the district court instructed the jury that Blair was on trial only for the two offenses charged in the indictment. The court described the elements of the two charged offenses and defined the government's burden of proof. These instructions minimized any risk of jury confusion or misleading the jury. United States v. Ramirez, 426 F.3d 1344, 1354 (11th Cir. 2005). In any event, the other evidence at trial against Blair was overwhelming, and thus there is no "reasonable likelihood" that any assumed evidentiary error affected Blair's substantial rights. See United States v. Drury, 396 F.3d 1303, 1315 (11th Cir. 2005) ("Evidentiary

23

errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights . . . ." (internal quotation mark omitted)).

2.    Kitchen Knife Evidence

Campbell argues that his Sixth Amendment right to confront witnesses against him was violated by the district court's admitting into evidence the knife seized at the scene of his arrest and Agent Horst's testimony that the knife was recovered from Campbell.  Campbell contends that the government did not identify or produce the ATF agent who first found the knife, and did not produce anyone with personal knowledge about the knife's origin.

The record reveals the following pertinent testimony.  At trial, Agent Horst testified that, after the defendants' arrest, he found out that a knife was recovered from Campbell.  The government then introduced the knife into evidence—a kitchen paring knife with an approximately three-inch blade.  On cross-examination, Horst admitted that he had no personal knowledge that Campbell ever possessed the knife, and did not know who had removed the knife from Campbell, aside from the fact that it was an ATF agent.

Later during trial, Agent O'Kelly testified that he was not present during Campbell's arrest, but came onto the scene once Campbell and his codefendants

24

were handcuffed and seated on the ground.  The prosecutor asked O'Kelly "what, if anything, was in or around [Campbell's] person" as O'Kelly took him into custody.  O'Kelly responded: "A knife and a red plastic lighter."  O'Kelly then acknowledged that he was not 100% certain that the knife came off Campbell.  O'Kelly also testified about standard operating procedures for searching individuals during arrest, explaining that suspects would be frisked for weapons and their personal effects would be removed and "put away at a safe distance."  On cross-examination, O'Kelly was asked where the kitchen knife was located, and O'Kelly testified that the kitchen knife was on the ground "in the vicinity" of Campbell.

With this testimony, we turn to Campbell's Sixth Amendment challenge.  The Sixth Amendment to the United States Constitution provides, in what is known as the Confrontation Clause, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Confrontation Clause "guarantees a defendant's right to confront those who 'bear testimony' against him," or, in other words, those who make "testimonial" statements.  Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309-10, 129 S. Ct. 2527, 2531 (2009) (citing and quoting Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004)).  The Supreme Court has given

25

examples of testimonial statements, such as ex parte in-court testimony, affidavits, depositions, prior testimony, or confessions. Id. at 310, 129 S. Ct. at 2531. "[T]he Confrontation Clause prohibits only statements that constitute impermissible hearsay." United States v. Jiminez, 564 F.3d 1280, 1286 (11th Cir. 2009).

Here, we first point out that the knife itself was not a testimonial statement within the meaning of the Sixth Amendment. Campbell's Sixth Amendment right to confront the witnesses against him was not violated by the admission of the knife into evidence.[9] Furthermore, Campbell on appeal does not challenge O'Kelly's testimony regarding the knife, which was based on O'Kelly's personal observation that the knife was on the ground in Campbell's vicinity, but only challenges Horst's statement that the knife came from Campbell.

We have little difficulty concluding that Horst's statement constituted inadmissible hearsay. See Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement that is offered to prove the truth of the matter asserted). Horst admitted that he did not have personal knowledge that Campbell ever possessed the knife, and did not know who had removed the knife. Thus, by stating that the

_____

[9]To the extent Campbell challenges admission of the knife based on the chain of custody, that challenge has no merit. Such a challenge goes to the weight of the evidence, not its admissibility. Melendez-Diaz, 557 U.S. at 311 n.1, 129 S. Ct. at 2532 n.1; see also United States v. Lopez, 758 F.2d 1517, 1521 (11th Cir. 1985).

26

knife came from Campbell, Horst was impliedly recounting a statement that he heard out of court, and none of the hearsay exceptions applied to render this statement admissible. See Fed. R. Evid. 803, 804 (listing hearsay exceptions).

However, even if Horst's hearsay statement was testimonial and violative of the Confrontation Clause, we must still consider whether the erroneous admission of Horst's statement was harmless. See United States v. Ignasiak, 667 F.3d 1217, 1235 (11th Cir. 2012). "The test for determining whether a constitutional error is harmless is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. at 1235 (internal quotation marks omitted).

After careful review, we conclude that the error in admitting Horst's testimony was harmless beyond a reasonable doubt, given the overall record in this case. First, on appeal, Campbell does not challenge O'Kelly's testimony that he saw the knife in Campbell's vicinity after his arrest. The jury could rely on this testimony to infer that the knife indeed came from Campbell. See United States v. Langford, 647 F.3d 1309, 1319 (11th Cir. 2011) ("[C]ircumstantial evidence may be used to establish an element of a crime, even if the jury could draw more than one reasonable inference from the circumstantial evidence . . . ."). Second, on cross examination, Horst admitted that he had no personal knowledge of the

27

knife's origin, which diluted the effect of Horst's testimony.  Third, given Horst's admission, his testimony was merely cumulative of O'Kelly's admissible testimony.  Fourth, in any event, evidence that Campbell possessed only a kitchen paring knife with a blade of three inches, if anything, would make it questionable that Campbell was on his way to rob a drug stash house protected by two or three individuals armed with guns.  In other words, the knife was barely relevant to the government's case against Campbell, and, as discussed above, other evidence against him was more than sufficient for conviction.  In fact, in its rebuttal closing argument, the government stated: "Members of the jury, if you don't like that knife, discount it. I don't care.  Don't even consider it in your deliberations."  The government stated that the thrust of its case was the loaded gun found in the defendants' vehicle, not the knife.  Accordingly, given O'Kelly's testimony, Horst's admission, the minimal value of the knife evidence, and the government's statement not to consider the knife, we conclude that Horst's inadmissible testimony was harmless beyond a reasonable doubt.  See United States v. Jones, 601 F.3d 1247, 1264 (11th Cir. 2010) (holding that a Confrontation Clause violation was harmless beyond a reasonable doubt, in part because the offending evidence was cumulative and the government's case against the defendant was "strong").

28

3.      Exclusion of Augustus's Expert Witness Testimony

On the seventh day of trial, the government called ATF Special Agent Michael Patrick, a Jamaican native, as an expert witness. Four months before trial, in October 2009, the government had provided notice to the defendants of its intention to call Agent Patrick as an expert witness regarding the translation and transcription of the post-arrest conversation between Augustus, Campbell, and McClain as they were sitting in the police car. Well before trial, the government also provided a transcript of the translation.

After Agent Patrick testified about his ability to write and speak the Patois dialect, the government played the defendants' post-arrest conversation and also introduced Patrick's written transcription of the translated conversation.[10] Copies of the written transcription were given to the jury earlier during trial. On both direct and cross examination, Agent Patrick admitted that his translation could contain errors. Agent Patrick explained that at times, he had trouble differentiating between the defendants' voices, particularly when they spoke Patois.

The next day, and after the government rested, defendant Augustus filed an

---

[10]Prior to being asked to translate the conversation, Agent Patrick had no involvement in the case. The written transcription was 13 pages long.

29

amended witness list that included Dr. Patrick Williams, the district court's

Jamaican Patois interpreter.  Augustus sought to have Dr. Williams testify as an

expert witness in Patois, explaining that Dr. Williams told him that Agent Patrick

had translated the defendants' post-arrest conversation incorrectly.

The government objected to Augustus's having Dr. Williams testify because

Augusts's expert witness notice was untimely.  The government pointed out that,

on October 9, 2009, four months before trial, it had timely notified the defendants

in writing that "ATF Special Agent Michael Patrick will testify regarding the

translation and transcription of the Patois and English conversation that took place

between Mr. Augustus, Mr. Campbell and Mr. McClain post-arrest while in the

back seat of his patrol car."

Sustaining the objection, the district court precluded Dr. Williams from

testifying because Augustus failed to provide timely notice of his expert and

because Dr. Williams, who was employed by the court, would have a conflict of

interest.  The court noted that Augustus had since October to obtain his own

expert in Patois.  The district court denied Augustus's request to proffer Dr.

Williams's testimony.

Augustus now contends that the district court abused its discretion in

excluding Dr. Williams's testimony about Agent Patrick's translation and

30

transcription.

A defendant's right to present a defense is grounded in the Fifth Amendment's guarantee of due process and the Sixth Amendment's Compulsory Process Clause, but that right is not boundless.  Taylor v. Illinois, 484 U.S. 400, 409-410, 108 S. Ct. 646, 653 (1988); see also United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 1264 (1998) ("[R]ules excluding evidence from criminal trials . . . do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." (internal quotation marks omitted)).  One such boundary is Federal Rule of Criminal Procedure 16(b)(1)(C), which provides that the defendant must, at the government's request, provide a written summary of any expert testimony that the defendant intends to use, provided the government has complied with a similar request by the defendant.  If the defendant fails to comply with Rule 16(b)(1)(C), "the court may prohibit the [defendant] from introducing the undisclosed evidence."  Fed. R. Crim. P. 16(d)(2)(C).  "Relief for violations of discovery rules lies within the discretion of the trial court; a defendant must show prejudice to his substantial rights to warrant reversal of that discretion."  United States v. Petrie, 302 F.3d 1280, 1289 (11th Cir. 2002) (internal quotation marks omitted).

In this case, there is no dispute that Augustus failed to provide timely notice

31

of his proffered expert witness. Augustus provided such notice on the eighth day of trial, almost two years after the indictment was returned and four months after the government notified him of its expert witness. Furthermore, Augustus failed to provide sufficient justification for his untimeliness. The government asserted at trial that it had notified Augustus in October 2009 that Agent Patrick would testify regarding the translation and transcription of the defendants' post-arrest conversation in the police car, and Augustus does not dispute this assertion. Thus, Augustus had ample time to find his own translator if he was concerned about Patrick's neutrality or accuracy of the translation, and his unexcused failure to timely notify the government of the expert witness provided sufficient grounds for the district court to exclude that witness's testimony. See Petrie, 302 F.3d at 1289 (holding that the district court did not abuse its discretion in precluding the defendant's expert from testifying because the defendant had provided untimely notice of the expert witness to the government).

Alternatively, even if the district court erred in excluding Dr. Williams's testimony, Augustus has failed to show any resulting prejudice. Although Augustus contends that he needed an expert witness to correct Agent Patrick's errors, Patrick readily admitted on both direct and cross examination that the voice assignments in the transcript of the post-arrest recording could contain errors. The

32

jury was thus aware that the translation may not have been wholly accurate.

Moreover, to this day, Augustus has not shown what translation errors Agent

Patrick actually committed and what Dr. Williams's testimony would have

revealed.  To be sure, Augustus did attempt to proffer Dr. Williams's testimony

during trial, and the district court refused to consider the proffer.  However, if the

translation errors were of any significance, Augustus still could have filed an

affidavit or post-trial motion describing the errors in the district court, or, at the

very least, could have demonstrated these errors on appeal.  Augustus failed to do

so, and thus has not shown that any translation error was prejudicial.  Accordingly,

we see no reason to reverse the district court's exclusion of Dr. Williams's

testimony.  See Petrie, 302 F.3d at 1289.

E.    **Augustus's and Campbell's Motions for Mistrial**

Augustus and Campbell contend that the district court abused its discretion

by denying their motions for mistrial.[11]  Both argue that McClain's testimony

---

[11]This Court reviews for abuse of discretion a district court's decision not to grant a mistrial.  United States v. Emmanuel, 565 F.3d 1324, 1334 (11th Cir. 2009).

We reject the government's argument that the defendants' claim as to McClain's testimony should be reviewed as invited error.  See, e.g., United States v. Brannan, 562 F.3d 1300, 1306 (11th Cir. 2009) (citing cases and explaining that "the doctrine of invited error is implicated when a party induces or invites the district court into making an error" (internal quotation marks and alteration omitted)).  The government bases its claim on the defendants' agreement to a curative instruction after the district court denied their mistrial motion.  Augustus and Campbell, however, do not argue that the instruction itself was erroneous.  They claim the district court erroneously denied their motion for mistrial.  And it was only after the court denied

33

implied they had prior criminal records. In addition, Augustus argues that certain testimony by Agent Zayas violated his right against self-incrimination.

In order to receive a mistrial, a defendant "must show that his substantial rights are prejudicially affected. This occurs when there is a reasonable probability that, but for the remarks, the outcome of the trial would have been different." United States v. Emmanuel, 565 F.3d 1324, 1334 (11th Cir. 2009) (internal quotation mark omitted). Further, "when the record contains sufficient independent evidence of guilt, any error was harmless." United States v. Newsome, 475 F.3d 1221, 1227 (11th Cir. 2007).

1.    McClain's Testimony

During the government's cross-examination of McClain, the following exchange took place:

Q: Did you know you were going to pull a [robbery] that day?
A: No, sir.
Q: You're the only one with a clean record?
A: Yes, sir.
Q: And you should have stayed home; do you remember saying that?
A: I said stay home? No, sir.

Augustus and Campbell objected to McClain's affirmation that he was the only one with a clean record, arguing that the prosecutor was referring to McClain's

---

their motion for a mistrial that a curative instruction was discussed.

34

lack of a criminal record, thereby implying that all defendants except McClain had prior convictions.  The prosecutor explained that he was simply referring to McClain's driving record, and the district court agreed with the government.[12]  Nevertheless, the district court gave a curative instruction to the jury to disregard that statement.

It is not clear from the context of the cross-examination what the prosecutor meant by "clean record."  Regardless of the prosecutor's intent, however, the district court did not abuse its discretion in denying the defendants' motions for a mistrial, given the court's curative instruction to the jury.  We have recognized that, if the district court instructs the jury to disregard prejudicial evidence, "we will reverse only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition."  United States v. Harriston, 329 F.3d 779, 787 n.4 (11th Cir. 2003) (internal quotation marks omitted); see United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005) (explaining that this Court presumes the jury follows the district court's instructions).  Augustus and Campbell assert that

---

[12]Earlier during trial, the government introduced evidence showing that Augustus did not want to be the driver for the planned robbery because his license was suspended, and that McClain was the driver of the gold Pontiac for the planned robbery because he possessed a driver's license.  More specifically, McClain testified that, on the day of the planned robbery, Augustus had asked him whether he wanted to drive the car and whether he had a driver's license, and McClain agreed to drive the car.  McClain's sister testified that, based on her substantial experience riding with McClain, he had not received any traffic tickets, had never been pulled over, and had never been speeding.

because McClain was the only defendant acquitted, his remark was necessarily prejudicial. However, unlike the scant evidence against McClain, the evidence against Augustus and Campbell was strong and convincing. As noted before, this evidence included testimony by the ATF agents involved in the investigation, recorded conversations, and physical evidence. We conclude that the defendants have not shown a "reasonable probability" that the trial's outcome would have been different without McClain's fleeting, and stricken, remark. See Emmanuel, 565 F.3d at 1334.

2.    Agent Zayas's Testimony

Augustus argues that his right against self-incrimination was violated during the following exchange between the government and Agent Zayas:

Q: Now, the day before in the parking lot it was discussed that it would be at Smokey Bones, correct?
A: That's correct.
Q: But now for some reason he's asking you again.
A: You'd have to ask him.
Q: But that's my question to you, correct?
A: Right. He asked me again, and I told him.

Augustus contends that Agent Zayas's remark, "[y]ou'd have to ask him," caused the jury to expect to hear him testify.

The Fifth Amendment to the U.S. Constitution bars the government from referencing the defendant's silence or failure to testify. U.S. Const. amend. V; see

36

also United States v. Guerra, 293 F.3d 1279, 1289 (11th Cir. 2002).  This Court

has recognized that "[a] comment is deemed to be a reference to the defendant's

silence if either (1) it was the prosecutor's manifest intention to refer to the

defendant's silence, or (2) the remark was of such a character that the jury would

naturally and necessarily take it to be a comment on defendant's silence."  Guerra,

293 F.3d at 1289 (internal quotation marks omitted).

Here, Agent Zayas's remark did not lead ineluctably to the conclusion by

the jury that it was a comment on Augustus's silence.  At most, the government's

question sought not a response about Augustus personally testifying, but rather,

sought a speculative response about Augustus's reason for repeating a question to

Agent Zayas.  In context, Agent Zayas's response to the government's question

referred to his inability to answer the question, rather than a comment on

Augustus's decision not to testify.  See id.  On this record, it was not "the

prosecutor's manifest intention to refer to the defendant's silence," nor was Agent

Zayas's response such that the jury necessarily would take it to comment on

Augustus's silence.  See id.

In any event, even if the comment was improper, the district court's jury

instructions explained that Augustus did not have to testify and had no burden

whatsoever, and the prosecutor subsequently made no reference to Agent Zayas's

37

comment. Thus, in light of the jury instructions, the evidence at trial, and the prosecutor's subsequent non-use of the remark, if there was error, it was harmless. See United States v. Smith, 635 F.2d 411, 413 (5th Cir. Unit B 1981).[13] Accordingly, the district court did not abuse its discretion in denying Augustus's motion for mistrial based on Agent Zayas's remark.

## F.    Blair's and Augustus's Request for an Entrapment Instruction

At the conclusion of the evidence, Blair and Augustus requested an entrapment instruction, but the district court denied their request. On appeal, they argue that the district court erred because the evidence was sufficient to support an entrapment instruction.[14]

Entrapment is an affirmative defense that consists of two elements: the government's inducement of the crime, and the defendant's lack of predisposition to commit the crime. United States v. Orisnord, 483 F.3d 1169, 1178 (11th Cir. 2007). The defendant bears the initial burden of showing the government's

---

[13]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[14]Whether the defendant's evidence of government inducement is sufficient to merit an instruction on entrapment is a legal issue to be decided by the district court. United States v. Sistrunk, 622 F.3d 1328, 1332-33 (11th Cir. 2010). However, this Court has not definitively resolved whether this means our review of the district court's decision is de novo or for abuse of discretion. See id. (citing conflicting case law). This Court, in Sistrunk, recently declined to clarify the appropriate standard of review. Id. at 1333. Similarly, we do not reach that issue because under either standard of review here, the outcome is the same.

inducement, which may be met "by producing any evidence sufficient to raise a jury issue that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." Id. (internal quotation mark omitted). "[E]vidence of the government's mere suggestion of a crime or initiation of contact is not enough. Instead, government inducement requires an element of persuasion or mild coercion." United States v. Brown, 43 F.3d 618, 623 (11th Cir. 1995) (citation omitted). It is only if the defendant meets his initial burden that he then becomes entitled to an entrapment defense, since "an evidentiary foundation for a valid entrapment defense must be present." United States v. Ryan, 289 F.3d 1339, 1343 (11th Cir. 2002). Nonetheless, if the defendant does meet his burden, "the question of entrapment [then] becomes a factual one for the jury to decide. . . . It is elementary law that the defendant in a criminal case is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence." United States v. Timberlake, 559 F.2d 1375, 1379 (5th Cir. 1977) (internal quotation marks omitted).

Neither Blair nor Augustus met their initial burden to warrant an entrapment instruction. The ATF agents merely suggested robbing the cocaine stash house. See Brown, 43 F.3d at 623. Blair and Augustus both had opportunities to decline

39

to participate in the robbery, but each time, they assured the ATF agents that they were willing to proceed. Further, prior to the robbery suggestion, Blair told the ATF agents that he could steal his customers' cars and break into their homes to rob them. After the robbery suggestion, Blair recruited Augustus, and told the agents that Augustus was experienced in robbery. Although both defendants assert that they so desperately needed money that they could not resist the robbery proposal, their own finances were not the result of government persuasion or coercion. In short, the evidence at trial showed no more than that the government presented an opportunity to commit a crime, which is not sufficient to merit an entrapment defense instruction.

**AFFIRMED.**

HILL, Circuit Judge, specially concurring:

Appellants make a strong showing that it was highly prejudicial to them for the government to spend the first full week of trial introducing testimony, guns, and drugs that bore absolutely no relation to the charges against them at trial. Nevertheless, the district court admitted this evidence, holding that its probative value outweighed its prejudicial effect.  In view of the great deference we afford the district court in this area, I shall not second guess the exercise of its discretion.

I concur.